Sandra K. LOYD, Plaintiff–Appellant,

v.

**PHILLIPS BROTHERS, INC., Defendant–Appellee.**

No. 92–1710.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1994.

Decided May 27, 1994.

---

Alexandra De Saint Phalle, Londrigan, Potter & Randle, Springfield, IL (argued), for plaintiff-appellant.

John A. Kauerauf, Sorling, Northrup, Hanna, Cullen & Cochran, Springfield, IL (argued), for Phillips Bros., Inc.

Before FLAUM and EASTERBROOK, Circuit Judges, and MILLER, District Judge.*

FLAUM, Circuit Judge.

While Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, is rather straight-forward on its own terms ("It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color religion, sex, or national origin. . . ."), a rather thick judicial gloss, over twenty years deep, has developed, in part to accommodate difficult matters of proof in diverse factual settings. Sometimes, however, too rigid adherence to the formulaic prescriptions of the appellate courts (which are laid out with particular factual settings in mind and are seldom as generalizable as purported) blocks proper analysis of what should be uncomplicated issues of discrimination. Something of the sort may well have occurred in this case, resulting in judgment for the defendant although the plaintiff's entitlement to relief was apparent.

Sandra Loyd, the plaintiff in this case, was employed by Phillips Brothers, Inc., the defendant, as a bookbinder. Like many other binderies, Phillips maintains three classes of bindery employees: J–1 workers, J–2 workers and GPWs (general production workers). Wages are set by collective bargaining with Graphic Communications International Union Local 132B. J–1s have always earned more than J–2s who in turn earn more than GPWs. According to the collective bargaining agreement, J–2s and GPWs are equally qualified and eligible to become J–1 apprentices (one serves a four year apprenticeship, earning progressively higher percentages of J–1 pay, before becoming a full-fledged J–1 binder), and Loyd in particular was qualified for a J–1 apprentice position.

Traditionally, and at all times relevant to this litigation, all J–1s were men, all J–2s were women and all GPWs were men. (As of August 14, 1989, there were seventeen J–1 journeymen and apprentices, eleven J–2 journeywomen and apprentices and six GPWs.) Hiring decisions at Phillips were made by the foreman, and the company had a policy of hiring from within for J–1 apprentice positions. The foreman would generally fill these positions by approaching eligible company workers in order of seniority; no written applications were required or submitted by new hires from within the company. The foreman, however, would not approach all non–J–1 bindery employees; rather, only GPWs, never J–2s, were sought out for the J–1 apprenticeships, although both are qualified and supposedly equally eligible. As a result, only men were solicited for vacant or new J–1 positions.

There were three openings for J–1 apprenticeships in the spring and summer of 1989. GPWs were asked in order of seniority if they wanted each position. Two GPWs, all with significantly less seniority than Loyd (in fact all of the GPWs at the time were much less senior than Loyd), and one male from outside the company, sought out because no GPWs were interested at the time (and in spite of Phillips' policy of hiring from within), eventually accepted the slots. Loyd was never approached (nor was any other J–2), and had she been, she would have accepted one of the available J–1 apprenticeships. The obvious consequence of the promotional system still in place in 1989 was that women workers at Phillips could not rise to the higher paying J–1 positions.

The above is uncontested. (Indeed, the parties stipulated to these facts below.) Unsurprisingly, Loyd, after obtaining a right-to-sue letter from the EEOC, sued Phillips, alleging that illegal sex-discrimination denied her a J–1 apprenticeship and identifying Phillips' practice of approaching GPWs and not J–2s as intentionally discriminatory.[1]

---

\* The Honorable Robert L. Miller, Jr. of the Northern District of Indiana is sitting by designation.

1. Loyd also argued that the practice of turning only to GPWs for J–1 slots alternatively supported Title VII liability on a "disparate impact"

theory. In a second count, she argued that by purposely maintaining separate job categories with separate wage scales for men and women, Phillips violated both Title VII and the Equal Pay Act, 29 U.S.C. § 206.

After a bench trial,[2] the district court found for the defendant, not because it concluded that blanketly favoring GPWs over J–2s for J–1 slots was not a dressed-up gender preference, but because "Plaintiff [did not] inform her superiors that she wished to be considered for a promotion" and "has not shown that she would have applied" had she known of the J–1 openings. Citing *Box v. A & P Tea Co.*, 772 F.2d 1372 (7th Cir.1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986), the district judge determined that Loyd therefore had not "established a *prima facie* case for discrimination based on disparate treatment."[3] Loyd wonders why she should be required to actively pursue a promotion when her male colleagues are not. So do we.

■■■ A little background is in order. The expression "prima facie case" in Title VII litigation popularly refers to a common, but not exclusive, *see Troupe v. Lord & Taylor*, 20 F.3d 734, 736–37 (7th Cir.1994), method of establishing a triable issue of intentional discrimination. Rather than (or in addition to) presenting evidence that the defendant acknowledged that discriminatory intent was behind its treatment of the plaintiff, or less direct evidence of the same such as suspicious timing or inappropriate remarks, or comparative evidence of systematically more favorable treatment toward similarly situated employees not sharing the protected characteristic, a plaintiff may employ an appropriate version of the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) burden-allocating technique to raise an inference of illegal motive. *See Troupe*, 20 F.3d at 736–37. By establishing a *McDonnell Douglas* prima facie case, a plaintiff shows that his complained-of employment circumstance "did not result from the two most common legitimate reasons on which an employer might rely . . .: an absolute or relative lack of qualification or the absence of a vacancy in the job sought."

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977). This "creates a presumption that the employer unlawfully discriminated against the employee," *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981), a presumption that can be rebutted, and hence its mandatory force obliterated, by the production of admissible evidence setting forth a legitimate, nondiscriminatory reason for the adverse employment action. *See St. Mary's Honor Center v. Hicks*, — U.S. —, — –—, 113 S.Ct. 2742, 2747–50, 125 L.Ed.2d 407 (1993). Even if the reasons proffered are eventually found by the trier of fact not to be the real reasons for the adverse treatment, to prevail the plaintiff must still carry his ultimate burden of persuasion—to prove by a preponderance of the evidence that an illegal motive was at work. The trier of fact *may* infer intentional discrimination from its disbelief of the reasons put forward by the defendant and the elements of the prima facie case alone but is not *required* to do so. *See id.; see also Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1123–24 (7th Cir. 1994). The presumption is rebutted by the production, not persuasiveness, of evidence of a nondiscriminatory explanation, and, *qua* presumption, it drops from the case. If, on the other hand, the defendant does not meet its burden of going forward with evidence to meet the presumption raised by the prima facie case, the presumption would, like any other legal presumption, stand unrebutted and entitle the plaintiff to judgment as a matter of law. *See Hicks*, — U.S. at —, 113 S.Ct. at 2748.

■■■ What constitutes the elements of a prima facie case presents a question of law. The basic formula is four-pronged and requires the plaintiff to establish his membership in a protected class, his eligibility for a position, adverse action taken against him

---

**2.** Loyd's claim under the Equal Pay Act was decided by a jury in Phillips' favor.

**3.** Judge Mills found the disparate impact theory wanting because of what he deemed an inadequate "statistical comparison between the gender composition of the pool of qualified applicants

and the gender composition of Bindery I apprentices" (despite the stipulated facts apparently establishing the contrary). He also rejected Loyd's other Title VII claim that Phillips paid J–2s less than J–1s out of an illicit desire to pay women less than men. *See infra.*

with respect to that position, and the continued availability of that position to others of like qualifications. The specifics, however, will inevitably vary and are dependent upon the type and circumstances of employment action under attack. *See McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *cf. Kralman v. Illinois Dept. of Veterans' Affairs,* 23 F.3d 150, 153 (7th Cir.1994). *McDonnell Douglas* itself dealt with a challenge to a hiring decision made in the context of an application-based hiring scheme; thus the second element required a showing that plaintiff both was qualified and had applied for the position denied to him. Like the first prong of a prima facie case—mandating membership in a protected class—requiring proof that a plaintiff actually applied for the post allegedly wrongly refused reflects standing-like concerns. *Cf. Gilty v. Village of Oak Park,* 919 F.2d 1247, 1251 (7th Cir.1990). More particularly, it closes the causal gap between the employer's decisionmaking process and the complained-of condition of the employee, thus allowing a tentative inference of bad motive on the employer's part. That is, only if the plaintiff would realistically have been in the running for the job absent the alleged discrimination will the tentative assumption that her current plight was caused by illegal discrimination be justifiable. One who does not apply for a position for which applications are required normally would not get the job in any event. But, of course, it is not true that the causal gap can never be bridged by something short of the formal submission of an application. The factual setting of a dispute, not an abstracted formulation never intended to be all things to all cases, will determine what steps a plaintiff needed to have taken in order to sufficiently demonstrate that discriminatory decisionmaking may have actually affected *his* employment situation. For instance, where an employer ordinarily entertains applications for a certain type of job but a plaintiff is deterred from applying by the very discriminatory practices he is protesting yet can show that he would have applied had it not been for those practices, a sufficient preliminary link between discrimination and adverse consequence is established. *See Teamsters,* 431 U.S. at 362–71, 97 S.Ct. at 1868–73;

*Babrocky v. Jewel Food Co. & Retail Meatcutters,* 773 F.2d 857, 867 (7th Cir.1985).

So too (indeed more so) where an employer does not solicit and await applications but hands out promotions on its own initiative in a nonselective, serial fashion. If the plaintiff alleges that the employer's decision not to approach people of her status was itself illegitimately motivated and shows that but for such a practice she likely would have been approached, then all she must do to complete the chain of causation that would permit an initial inference of discriminatory treatment actually affecting her job situation is establish that, had the employer approached her, she would have accepted the offered position. This is not a dramatic tailoring of *McDonnell Douglas'* second element; in fact it is a logical one, but it is one the district court did not consider. The district court concentrated on our opinion in *Box,* where we said that "[w]hen an employer uses a promotion system in which employees do not apply for promotions but rather are sought out by managers, ... the plaintiff can establish the application element of a prima facie case by showing that, had she known of an assistant manager opening, she would have applied." *Box,* 772 F.2d at 1377. In *Box,* however, nothing suggested "anything more than a vague interest" in any one of the several positions in the company not offered to the plaintiff. It was impossible to identify the discriminatory harm, if any, suffered by the plaintiff without some firm indication of what her employment desires were. *See id.*

Here, by contrast, what would have been if not for the practice Loyd alleges was discriminatory is indisputable. Company policy was to hire from within; J–2s were equivalent to GPWs for J–1 eligibility purposes; the foreman's practice in filling the 1989 slots was to approach eligible workers strictly by seniority and give each position to the first taker; Loyd was the second-most senior J–2 *or* GPW at the time; *she would have taken a J–1 apprenticeship offered to her.* Indeed, the causal link between the allegedly discriminatory hiring process and Loyd's nonpromotion is *stronger* than in the paradigmatic *McDonnell Douglas* situation where, even assuming away discriminatory

motives, the submission of an application would not necessarily result in hiring. *Accord Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1132–33 (11th Cir.1984). Because Loyd's interest in a J–1 apprenticeship (that is her desire for and willingness to accept the position) was established—as were the facts that she was qualified for the job, that she was not offered the job yet would have been but for the allegedly discriminatory practice and that like-qualified and like-nonapplying males were made offers—Loyd amply made out a *McDonnell Douglas* prima facie case; the district court erred by saying that she did not.[4] If Phillips did not carry its burden of producing a legitimate, nondiscriminatory reason for its practice of preferring GPWs and outside males to J–2s for J–1 positions, judgment should be entered for Loyd without proceeding further.

■ We have the entire trial record before us and, having reviewed it thoroughly, we confidently conclude that Phillips did not carry its burden, and thus there is no need to remand this case to determine whether Loyd carried her ultimate burden of persuasion. The reasons put forward by Phillips through admissible evidence are neither legitimate nor nondiscriminatory. In fact, by and large, they are not reasons. Both in its brief to the district court and in its brief here, Phillips summarizes its position thusly: "The hiring of the most senior of the low-paid GPWs or the most qualified applicant when no in-house candidates apply are unquestionably legitimate non-discriminatory reasons for making an employment decision." This is no more than a restatement of the challenged practice. We have scoured the record for other proffered reasons and none of the few to be found legitimately and nondiscriminatorily account for the practice of approaching all GPWs in order of seniority and, if none

were interested, hiring from without, all the while bypassing J–2s. Exforeman Charlie Patterson testified that GPWs were traditionally preferred because, as a general matter, they would often express interest in J–1 positions and because the opportunity for promotion would encourage people to accept the "bottom of the totem pole" GPW positions in the first instance and also would reward their hard work.[5] This, however, does not explain why Phillips would systematically approach all GPWs by seniority when several had previously and repeatedly declined J–1 slots offered in the past, nor does it explain why Phillips would turn to outsiders, instead of J–2s, when no GPWs would accept an available J–1 apprenticeship. Chris DiPasquale, foreman at the time of the contested 1989 hirings, also testified that he did not approach J–2s because he assumed they would not be interested in the J–1 slots. He acknowledged that this assumption in part was based upon his belief that women did not want to get dirty and greasy. Because stereotypical attitudes about women are not legitimate "reasons" for treating them differently from men, and because DiPasquale offered no other basis for his assumption and neither he nor any other company witness presented any adequate reason for the manner in which Phillips preferred (male) GPWs and (male) outsiders to (female) J–2s in 1989, the presumption of discrimination raised under the circumstances of this case was never rebutted. Loyd is entitled to judgment in her favor on Count I of her complaint.

■ Count II of Loyd's complaint challenged the wage differential between J–1 and J–2 positions. Loyd does not attack the jury verdict for Phillips under the Equal Pay Act (essentially amounting to a finding that J–1s and J–2s do not perform "equal work")

---

4. The district court also erred by not considering the other evidence of intentional discrimination present in this case, implicitly concluding that the *McDonnell Douglas* mechanism was the only way by which a Title VII plaintiff can succeed. For instance, the 100% sex-segregated workforce is highly suspicious and is sometimes alone sufficient to support judgment for the plaintiff. *See Babrocky,* 773 F.2d at 867 n. 7; *see also Teamsters,* 431 U.S. at 342 n. 23, 97 S.Ct. at 1858 n. 23 (commenting upon the peculiarly persuasive

quality of "the inexorable zero"). Similarly, that Phillips' promotional procedure inexorably maintained the existing zero is strong evidence that it was intended to do so. The court also did not address some rather damning testimony of the foreman who conducted the 1989 hiring of J–1 apprentices for Phillips. *See infra.*

5. Hiram Phillips, the chief executive officer of the company, testified to the same general effect.

but does appeal the district court's rejection of her Title VII theory. Even when jobs are not sufficiently similar to constitute "equal work" under the Equal Pay Act, a Title VII claim for wage discrimination is not precluded. *See County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). What must be shown is quite specific, however, as "comparable worth" is not a theory of liability under Title VII. *See EEOC v. Madison Community Unit School Dist. No. 12*, 818 F.2d 577, 587 (7th Cir.1987); *American Nurses' Ass'n v. Illinois*, 783 F.2d 716 (7th Cir.1986). There must be an *intent* to discriminate, and the intent must encompass an actual desire to *pay* women less than men because they are women. *See id.* at 588. When comparing male and female remuneration in dissimilar jobs, this becomes a rather demanding standard, whose particularity does not allow for proof via an assumption-laden scheme of prima facie cases, presumptions and rebuttals, but rather requires that the plaintiff persuade the fact-finder directly that a sex-based compensation program was at work. *See EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 340–43 (7th Cir.1988); *County of Washington v. Gunther*, 452 U.S. at 184–85, 203–04, 101 S.Ct. at 2255, 2265 (Rehnquist, J., dissenting). *Contra Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528–31 (11th Cir.1992).[6] On this score, the district court's opinion, while brief, concludes that Loyd did not prove that Phillips paid J–2s less than J–1s for sex-based reasons. This finding of a lack of discriminatory intent may well be erroneous, but since it is not clearly erroneous, we must sustain it. *See Rogers v. Western–Southern Life Insurance Co.*, 12 F.3d 668, 673 (7th Cir.1993). Here, there is no smoking gun; J–2s earn

more than the all-male GPWs; and wages were set by collective bargaining. These things do not, alone or in combination, preclude a finding of intentional wage discrimination, but they do, under the circumstances of this case, preclude a conclusion of clear error. Wage discrimination is different than the realization of a desire to separate male and female workers, even if it is the women who end up receiving a lower wage. An employer's intent to pay women less does not always accompany an intent to maintain a segregated workforce although the latter (a Title VII violation in its own right) is certainly probative—and, to the trier of fact, can be persuasive—of the former. So even if it were clear that Phillips kept women in J–2 positions because they were women, more must be shown to *compel* a finding that this sex-segregation was motivated by wage (as opposed to social, physical, sexual or other, though not laudable, non-wage-related) considerations. More was not shown here, and the mid-level pay of women at Phillips coupled with the existence of a bargaining process setting wages is at best neutral evidence in this regard.

We therefore affirm the judgment of the district court with respect to Count II. We reverse the judgment with respect to the promotion discrimination claim contained in Count I of the complaint and remand with instructions to enter judgment for the plaintiff. Pursuant to Circuit Rule 36, the case shall be assigned to a different district judge for determination of damages.

*It is so ordered.*

---

**6.** By requiring "direct" proof of discriminatory intent, we do not mean to imply that circumstantial *evidence* (at least amounting to something more than the bare submission of comparable worth studies, *see Sears*, 839 F.2d at 342–43) can never carry the day for a plaintiff alleging intentional wage discrimination under Title VII. *Compare Elliott v. Thomas*, 937 F.2d 338, 345 (7th Cir.1991) (noting "there is no principled difference between direct and circumstantial evidence"), *cert. denied*, —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992). Rather, our point is that the *McDonnell Douglas* burden-shifting

scheme does not import well into an area where wage discrimination claims are based on pay differences between dissimilar jobs. The approach would inject into the liability analysis notions of comparable worth which, under prevailing statutory conditions, have been banished from our jurisprudence. A Title VII wage-discrimination plaintiff comparing wage rates in dissimilar jobs retains at all times the burden of convincing the fact finder, without resort to shifting burdens or similar procedural devices, that her employer intended to suppress her wages on account of her sex (or other protected characteristic).