George MATTHEWS, Jr.

v.

Marvin RUNYON, Postmaster General.

No. 92–C–873.

United States District Court,
E.D. Wisconsin.

June 15, 1994.

John D. Uelmen, Fair Employment Legal Services, Milwaukee, WI, for plaintiff.

James L. Santelle, Asst. U.S. Atty., Milwaukee, WI, for defendant.

### DECISION AND ORDER

WARREN, District Judge.

Before the Court is the defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c) ("Rule 56(c)") in the above-captioned matter. For the following reasons, his motion is granted, and this case is dismissed.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff George Matthews, Jr. is a black male. (Compl. ¶ 3.) In July of 1989, he applied for a position as a mail handler with the United States Postal Service ("USPS") at the Milwaukee Post Office. (Pl. Mem. in Opp'n to Def. M. for Summ. J. ¶ 4; Lang Aff. ¶ 3.) On July 12, 1989, Mr. Matthews took the mail handler examination, and his name appeared on the hiring worksheet with a rating of 91.50 CP. (*Id.*) A hiring worksheet is a computer-generated list of names of USPS applicants, ranked according to their mail handler examination scores and upward adjustments based on veteran status. (Lang Aff. ¶ 4.) Mr. Matthews achieved a raw score of 81.50 on the written examina-

tion, and received 10 points of additional credit based on his veteran's preference. (*Id.*)

Luann Lang, a white female, is a human resources specialist in the Milwaukee Post Office and was the examinations network coordinator in October of 1989. (Lang Aff. ¶ 1.) At all times relevant to this action, she was responsible for initial examinations, hiring registers, career and transitional hiring, rehiring, and reinstatements. (*Id.* at ¶ 2; Pl. Mem. in Opp'n to Summ. J. ¶ 5.) In October of 1989, the USPS began to fill 22 vacancies for mail handler and mail processor positions at the Milwaukee Post Office. (Lang Aff. ¶ 5.) At that time, Mr. Matthews received a call-in notice requesting that he come to the Milwaukee Post Office for a group interview. (*Id.* at ¶ 6.) At the interview, Ms. Lang and a mail handler supervisor explained the duties of the mail handler position, the salary and benefits of the job, the prescreening application process, and the method of selection. (*Id.*) The applicants were also given a tour of the workroom floor and completed strength and stamina tests. (*Id.*) According to Ms. Lang, at the end of the group interview, she met with each applicant, including Mr. Matthews, for about 10 minutes in the hall, during which she reviewed his or her application and answered any questions about the hiring process. (*Id.* at ¶ 7.) Mr. Matthews, however, indicates that, during the October interview, Ms. Lang never met with him personally; instead, during a second interview in November of 1989, she "called him out in the hall and told him that he was a 'criminal' and 'had a felony.'" (Def. Mem. in Opp'n to Def. M. for Summ. J. ¶ 8.) According to Mr. Matthews, this encounter lasted one or two minutes, and he was given no opportunity to explain his employment background or the circumstances surrounding his pending criminal charge. (*Id.*)

After she received the background information, employment verification, and criminal records of each applicant, Ms. Lang used the "rule of three" to make her employment selections off of the hiring worksheet. (Lang Aff. ¶ 8.) The "rule of three" requires that the hiring official designate the applicants with the top three scores on the hiring work-sheet as the top three candidates. (*Id.* at ¶ 9.) After one of the three is chosen as the best qualified, the two unsuccessful applicants are considered for the next vacancy along with the next-highest rated person on the hiring worksheet. (*Id.*) The hiring official need not choose the applicant among the three with the highest score on the hiring worksheet in making any of these hiring decisions. (*Id.*) This process continues until an applicant has been considered for three vacancies and is not selected for the position, at which point he or she is designated as "NS-3" and no longer considered a candidate for hiring. (*Id.*) When considering three veteran preference or three non-veteran applicants from the hiring worksheet for a position, Ms. Lang compares their employment history, conviction record, and general employment suitability. (*Id.* at ¶¶ 10, 11.) Special rules are employed when veteran preference eligibles are competing against non-veteran applicants. (*Id.* at ¶ 10.)

In the October of 1989 round of hiring, Ms. Lang considered Mr. Matthews for employment three times. (*Id.*) In the first round, he was grouped with Keith Beyer, a white male who scored 100.30 CP on the written test, and Rommie Taylor, a black male who scored 93.40 CP on such examination; Ms. Lang selected Mr. Taylor. (*Id.* at ¶ 12.) Mr. Taylor had a history of two traffic offenses; a 1986 driving violation and a suspension of his license in 1988 for driving while intoxicated. (*Id.*) Ms. Lang did not consider these traffic violations significant because mail handlers are not required to drive; in addition, Mr. Taylor had a record of steady employment and had not been discharged by any previous employer. (*Id.*)

In the second round, Mr. Matthews was considered along with Keith Beyer and Gerald Coney, a black male who scored 90.60 CP on the written test; Ms. Lang selected Mr. Coney. (*Id.* at ¶ 13.) Mr. Coney had a 1987 reckless driving conviction and a 1984 assault and battery conviction. (*Id.*) Ms. Lang noted that his assault and battery conviction resulted in only a $150.00 fine and had occurred more than five years ago. (*Id.*) In addition, he had a more steady employment history than Mr. Matthews. (*Id.*)

In the third round, Mr. Matthews was considered along with Thomas Crawford, a white male who scored 90.60 CP on the written test, and Timothy Misfeldt, a white male who scored 90.60 CP on such examination; Ms. Lang selected Mr. Misfeldt. (*Id.* at ¶ 14.) Mr. Misfeldt had a 1984 traffic violation and, in September of 1987, had been fired from his position as a manager at a plasma donor center. (*Id.*) Mr. Matthews indicates that Ms. Lang gave Mr. Misfeldt, but not him, an opportunity to explain the circumstances surrounding his discharge. (Pl. Mem. in Opp'n to Def. M. for Summ. J. ¶ 13.) Ms. Lang was not concerned with Mr. Misfeldt's managerial deficiencies as he was not being hired for a supervisory position. (Lang Aff. ¶ 14.) In addition, he had recently been hired as a casual employee of the USPS. (*Id.*) In none of his three considerations was Mr. Matthews competing with non-veteran applicants. (*Id.* at ¶ 10.)

Mr. Matthews was arrested sixteen times between 1972 and 1989. (Def. Mem. Supp. Summ. J., Ex. 1.) His arrest record indicates that he was convicted in 1972 of issuing a worthless check and received a fine and suspended sentence. (*Id.* at ¶ 15.) Ms. Lang indicates that Mr. Matthews was convicted in 1971 of disorderly conduct and completed one year's probation; as noted by Mr. Matthews, however, his arrest record contains no such conviction. (*Id.*; Pl. Mem. in Opp'n to Def. M. for Summ. J. at 11, ¶ 6.) In 1973, he was convicted of criminal damage to property; while Ms. Lang also indicates that he was convicted of battery, Mr. Matthews correctly notes that his arrest record contains no such conviction. (*Id.*) In 1983, he served a two-year term of probation for resisting/obstructing a police officer. (Lang Aff. ¶ 15.) Charges of carrying a concealed weapon (a misdemeanor) and endangering safety by use of a dangerous weapon (a felony) were also pending against Mr. Matthews when he filed his application in 1989. (*Id.*; Pl. Mem. in Opp'n to Def. M. for Summ. J. ¶ 6.) On November 2, 1989, Mr. Matthews' attorney, John Uelmen, sent to the USPS Equal Employment Office a letter indicating that the pending charge against Mr. Matthews was a misdemeanor and that Mr. Matthews had never been formally charged

or convicted of a felony. (*Id.* at ¶ 9.) In addition, while Ms. Lang received favorable reviews of his work as a union laborer from three employers in the construction industry, he had been fired from the Merco Corporation after working for just three days in July of 1989; Merco officials stated that they would not rehire Mr. Matthews. (Lang Aff. ¶ 15; Pl. Mem. in Opp'n to Def. M. for Summ. J. ¶ 7.) Mr. Matthews indicates that, had Ms. Lang given him an opportunity to explain the circumstances surrounding his discharge, she would have learned that he and several co-workers had walked off the Merco job site after being asked to remove asbestos without proper equipment. (Pl. Mem. in Opp'n to Def. M. for Summ. J. at 8, ¶ 1.) According to Mr. Matthews, the Merco job site was subsequently shut down by OSHA, which the USPS could have verified when Merco submitted to it a second, more favorable review sheet upon Mr. Matthews' request in October of 1990. (*Id.*)

Ms. Lang was concerned with Mr. Matthews' criminal record because he had more criminal convictions than those with whom he was competing, and they were more serious than traffic violations. (Lang Aff. ¶ 15.) She was also concerned about protecting the sanctity of the U.S. mail and the safety of USPS employees, and questioned his "suitability" should he be convicted of his pending charges. (Pl. Mem. in Opp'n to Def. M. for Summ. J. ¶¶ 11, 12.) She was also worried that his application did not exhibit a history of successful long-term employment. (Lang Aff. ¶ 15.) According to Ms. Lang, she did not hire Mr. Matthews because he was not the best qualified for the mail handler position due to his "questionable employment history" and his conviction record. (*Id.* at ¶ 16.)

While USPS regulations state that arrest records may not be considered for purposes of hiring, a selecting official may consider prior convictions and inquire about any pending charges. (Miranda Aff. ¶ 6.) According to Mr. Matthews, however, "[i]n practice, the Postal Service's policy permits the selecting official to consider an applicant's arrest record in making a hiring decision." (Pl. Mem. in Opp'n to Def. Mem. in Supp. of Summ. J.

¶ 3.) This is significant, he argues, because statistics indicate that such practices have a disparate impact on blacks, who are arrested in much higher percentages than whites in the City of Milwaukee. (*Id.* at ¶ 1.) Mr. Matthews also indicates that, under USPS regulations, if conviction on pending charges would make an applicant unsuitable, hiring officials may not take any action on the application until the charges are resolved. (*Id.* at ¶ 12.)

On March 7, 1990, upon meeting with Ms. Lang, Mr. Matthews learned that he had not been selected for any vacancies. (Compl. ¶ 9.) According to Mr. Matthews, Ms. Lang told him that he had not been hired "because he was a 'criminal and had a criminal background' and had a 'felony conviction.'" (Pl. Mem. in Opp'n to Def. M. for Summ. J. ¶ 14.) Soon thereafter, Mr. Matthews was convicted of disorderly conduct as a result of his pending 1989 charges. (*Id.* at ¶ 15.)

On March 15, 1990, he contacted an Equal Employment Office counselor. (Miranda Aff. ¶ 3.) The USPS investigated his complaint, and Mr. Matthews requested a hearing before an Equal Employment Opportunity Commission ("EEOC") Administrative Law Judge ("ALJ"). (*Id.*) After conducting a hearing on September 29, 1991, the Administrative Law Judge recommended a finding of discrimination against the USPS. (*Id.*) On November 19, 1991, the USPS issued a final agency decision, finding no discrimination pursuant to regulations which allow the USPS to reject an ALJ's finding of discrimination. (*Id.* at ¶ 4.) On August 4, 1992, Mr. Matthews appealed this final agency decision to the EEOC; the EEOC affirmed the USPS decision, again rejecting the findings of discrimination previously made by the ALJ. (*Id.*)

On August 18, 1992, Mr. Matthews filed the instant Complaint, claiming discrimination in hiring on the basis of race under disparate impact and disparate treatment theories and "seeking actual damages, placement into a position with back pay, attorney's fees and costs, and injunctive and equitable relief pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ('Title VII')." The defendant answered on October 14, 1992, denying such charges and raising several affirmative defenses. The defendant filed the instant motion on August 2, 1993; the plaintiff responded on August 30, 1993, and the defendant replied on September 28, 1993. The Court holds subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(3), and proper venue pursuant to 28 U.S.C. § 1391(b).

## II. *STANDARD OF REVIEW*

Rule 56(c) deems summary judgment appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A genuine issue of fact exists only where a reasonable jury could make a finding in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). An issue of fact must also be material, as "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. *See also Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992); *Local 1545, United Mine Workers of Am. v. Inland Steel Coal Co.,* 876 F.2d 1288, 1293 (7th Cir.1989). The presence of a genuine issue of material fact is to be determined by the substantive law controlling that case or issue. *Anderson,* 477 U.S. at 254–55, 106 S.Ct. at 2513–14; *Santiago,* 894 F.2d at 221. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine need for trial and summary judgment is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Local 1545,* 876 F.2d at 1292. Once this burden is met, the non-

moving party must "go beyond the pleadings" and designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Local 1545,* 876 F.2d at 1293. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Koclanakis v. Merrimack Mut. Fire Ins. Co.,* 899 F.2d 673, 675 (7th Cir.1990), or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir. 1989); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985), and both parties must produce proper documentary evidence to support their contentions. *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990); *Local 1545,* 876 F.2d at 1293. In deciding a summary judgment motion, the Court must view the record in the light most favorable to the non-moving party, and all reasonable inferences shall be drawn in that party's favor. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Santiago,* 894 F.2d at 221. A court need not draw every inference from the record, only reasonable inferences. *Local 1545,* 876 F.2d at 1292–93; *Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883, 886 (7th Cir.1989).

## III. DISCUSSION

### A. LEGAL STANDARD:

#### 1. Disparate Treatment:

■ Under Title VII, it is "an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." 42 U.S.C. § 2000e–2(a)(1). In discrimination cases "where the disparate treatment of a single employee is at issue, a plaintiff can either produce direct or indirect evidence of discrimination." *Kirk v. Federal Property Management Corp.,* 22 F.3d 135, 138 (7th Cir.1994). Direct evidence of discrimination, of course, includes any acknowledgement by the defendant that discriminatory intent was behind its treatment of the plaintiff; circumstantial evidence, including suspicious timing, inappropriate remarks, and "comparative evidence of systematically more favorable treatment toward similarly situated employees not sharing the protected characteristic," may also be used to establish intentional discrimination. *Loyd v. Phillips Bros., Inc.,* 25 F.3d 518, 522 (7th Cir.1994). *Accord Troupe v. The May Department Stores Co.,* 20 F.3d 734, 736–37 (7th Cir. 1994).

The indirect method, on the other hand, involves the burden-shifting approach established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Id.* Under this method, the plaintiff must first establish a prima facie case of discrimination by showing that (1) the plaintiff belongs to a protected group, (2) the plaintiff applied and was qualified for the position at issue, (3) the plaintiff was rejected for that position despite his or her qualifications, and (4) the employer hired someone outside the protected group. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1791–92; *Loyd,* 25 F.3d at 522–23; *Kirk,* 22 F.3d at 137–38. The plaintiff must prove his or her prima facie case by a preponderance of the evidence. *Burdine,* 450 U.S. at 252, 101 S.Ct. at 1093; *Kirk,* 22 F.3d at 137–38. Upon proving such a case, a presumption is created that the employer unlawfully discriminated against the plaintiff. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Loyd,* 25 F.3d at 137–38.

■ Once the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant, who must produce some legitimate nondiscriminatory reasons for the challenged employment decision. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747–50, 125 L.Ed.2d 407 (1993); *Burdine,* 450 U.S. at 252, 101 S.Ct. at 1093; *Kirk,* 22 F.3d at 138. To meet this standard, the explanation given by the defendant "must be legally sufficient to justify a [favorable] judgment." *Kirk,* 22 F.3d at 138. If the defendant produces no

evidence to support a nondiscriminatory basis for acting, the presumption raised by the prima facie case, like any other legal presumption, stands unrebutted and entitles the plaintiff to judgment as a matter of law. *Hicks,* ——— U.S. at ———, 113 S.Ct. at 2748; *Loyd,* 25 F.3d at 522–23.

■ If the defendant produces legitimate nondiscriminatory reasons for its decision, however, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that such reasons were a pretext for discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *Kirk,* 22 F.3d at 138. "In trying to establish a basis that an employer's explanation was merely pretextual, an employee must 'focus on the specific reasons advanced by the defendant to support the discharge,'" rebutting them by direct evidence or by showing that they have no basis in fact, are not the "real" reason for failure to hire, or are insufficient to warrant such decision. *Lenior v. Roll Coater, Inc.,* 13 F.3d 1130, 1133 (7th Cir.1994) (citing *Smith v. Gen. Scanning, Inc.,* 876 F.2d 1315, 1319 (7th Cir.1989), and *Aungst v. Westinghouse Elec. Corp.,* 937 F.2d 1216, 1220–21 and 23 (7th Cir.1991)). Once the defendant produces legitimate nondiscriminatory reasons for its decision, the plaintiff must still "carry his ultimate burden of persuasion—to prove by a preponderance of the evidence that an illegal motive was at work," even if the finder of fact rejects the reasons proffered by the defendant. *Loyd,* 25 F.3d at 522. *See also Hicks,* ——— U.S. at ———, 113 S.Ct. at 2748; *Kirk,* 22 F.3d at 138 (citing *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095). As noted in *Loyd:*

> "[t]he trier of fact *may* infer intentional discrimination from its disbelief of the reasons put forward by the defendant and the elements of the prima facie case alone but is not *required* to do so. The presumption is rebutted by the production, not persuasiveness, of evidence of a non-discriminatory explanation, and *qua* presumption, it drops from the case."

*Id.* at 522 (citations omitted).

### 2. *Disparate Impact:*

■ In *Landgraf v. USI Film Products,* ——— U.S. ———, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Supreme Court held that provisions of the Civil Rights Act of 1991 ("1991 Act") which "would have an impact on private parties' planning" by "attach[ing] an important new legal burden to [their] conduct" are not to be applied retroactively to cases where the defendant's alleged discriminatory conduct occurred prior to its November 19, 1993 effective date. *Id.* at ———, 114 S.Ct. at 1505–06 (failing to retroactively apply jury trial, compensatory damages, and punitive damages provision of 1991 Act). Section 105 of the 1991 Act provides, in relevant part, as follows:

> "Sec 105. **BURDEN OF PROOF IN DISPARATE IMPACT CASES.**
>
> (a) Section 703 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–2) is amended by adding at the end the following new subsection:
>
> '(k)(1)(A) An unlawful employment practice based on disparate impact is established under this title only if—
>
> (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin *and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity;* or
>
> (ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.
>
> (B)(i) With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

(ii) If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.

(C) *The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of 'alternative employment practice.'*

(2) *A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination under this title ...'*

(3)(b) *No statements other than the interpretive memorandum appearing at Vol. 137 Congressional Record S 15276 (daily ed. Oct. 25, 1991) shall be considered legislative history of, or relied upon in any way as legislative history in construing or applying, any provision of this Act that relates to Wards Cove—Business necessity/cumulation/alternative business practice."*

See 42 U.S.C. § 2000e–2(k) (emphasis added). As noted by the Supreme Court, section 105 of the [1991] Act is "a direct response" to its June 5, 1989 decision in *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), and is intended to codify certain concepts enunciated in pre-*Wards Cove* decisions. *See Landgraf,* — U.S. at —, n. 3, 114 S.Ct. at 1489, n. 3. However, because the changes in Title VII disparate impact law codified in section 105 affect the liability of defendants by restoring their burden of proving business necessity, re-establishing that proof of business necessity is not a defense to intentional discrimination, and restoring the pre-*Wards Cove* definition of "alternative business practice," they cannot be retroactively applied in cases, such as this one, where alleged discriminatory conduct occurred prior to November 19, 1991. *See id.* at —, 114 S.Ct. at 1505–06; *Williams v. Carson Pirie Scott,* 1992 WL 229849, at *3 (N.D.Ill. September 9, 1992) (finding section 105 "irrelevant," and application of *Wards Cove* proper, in Title VII disparate impact analysis where alleged discriminatory firing occurred prior to effective date of the 1991 Act).

It has always been recognized that Title VII proscribes "not only overt discrimination [disparate treatment] but also practices that are fair in form but discriminatory in practice [disparate impact]." *E.E.O.C. v. Switching Sys. Div. of Rockwell Intern. Corp.,* 783 F.Supp. 369, 373 (N.D.Ill.1992) (citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)). *See also Wards Cove,* 490 U.S. at 645, 109 S.Ct. at 2119. Under the latter theory of liability, "a facially neutral employment practice may be deemed violative of Title VII without evidence of the employer's subjective intent to discriminate." *Id.* at 645–46, 109 S.Ct. at 2119; *Fisher v. Transco Services–Milwaukee, Inc.,* 979 F.2d 1239, 1245 (7th Cir.1992); *Switching Systems,* 783 F.Supp. at 372. A single decision by an employer may be actionable under a disparate impact theory. *Council 31, AFSCME v. Ward,* 978 F.2d 373, 377–78 (7th Cir.1992).

Under *Wards Cove,* which is applicable to this case, a plaintiff establishes a prima facie case of disparate impact by (1) identifying the specific employment practice challenged, (2) demonstrating that the challenged practice had a disparate impact on employment opportunities for a group protected by the statute, and (3) establishing a causal link between the disparate impact and the challenged employment practice. *Id.* at 655–58, 109 S.Ct. at 2123–25. In establishing his or her prima facie case, a disparate impact plaintiff may rely on statistical evidence showing the disproportionate effect of the challenged employment practice on members of the protected class. *Maganuco v. Leyden Community High Sch. Dist. 212,* 939 F.2d 440, 443 (7th Cir.1991); *United Ass'n of Black Landscapers v. City of Milwaukee,* 916 F.2d 1261, 1264 (7th Cir.1990); *Switching Systems,* 783 F.Supp. at 372. Such plaintiffs are also " 'responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.' " *Wards Cove,* 490 U.S. at 656, 109 S.Ct. at 2124 (quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 2789, 101 L.Ed.2d

827 (1988)); *Black Landscapers*, 916 F.2d at 1264. The latter establishes the requisite causal link between the employer's actions and the existence of a statistically imbalanced work force; without it, the plaintiff has not established a prima facie case of disparate impact. *Id.* at 657–58, 109 S.Ct. at 2124–25; *Black Landscapers*, 916 F.2d at 1264.

If the plaintiff makes out a prima facie case, the defendant bears the burden of coming forward with a business justification for its practice by showing that the "challenged practice serves, in a significant way, the legitimate employment goals of the employer." *Wards Cove*, 490 U.S. at 659, 109 S.Ct. at 2126; *Switching Systems*, 783 F.Supp. at 372. While the defendant bears the burden of production in such circumstances, the burden of persuasion with respect to the disparate impact theory remains at all times with the plaintiff. *Wards Cove*, 490 U.S. at 659, 109 S.Ct. at 2126; *Switching Systems*, 783 F.Supp. at 372.[1] If the defendant produces evidence that its practice resulted from business necessity, the plaintiff bears the burden of demonstrating alternative employment practices which would equally serve the employer's business purposes without undesirable discriminatory effects. *Wards Cove*, 490 U.S. at 660, 109 S.Ct. at 2126–27; *Switching Systems*, 783 F.Supp. at 372. By meeting this burden, the plaintiff would show that the employer was utilizing the challenged practice " 'merely as a 'pretext' for discrimination.' " *Wards Cove*, 490 U.S. at 660, 109 S.Ct. at 2126 (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975)).

## B. *PARTIES' ARGUMENTS:*

The defendant first argues that Mr. Matthews cannot make out a prima facie case of intentional discrimination under a disparate treatment theory. He indicates that, of the three vacancies for which Mr. Matthews was considered, two were filled by black males who were chosen over Mr. Matthews and another non-selected white male applicant.

Even if Mr. Matthews can establish a prima facie case, however, the defendant claims that Ms. Lang had legitimate, non-discriminatory reasons for failing to hire Mr. Matthews, as he was less qualified than those hired after comparing conviction and employment records. Given this, he argues that Mr. Matthews cannot meet his burden of proving disparate treatment. As to disparate impact, the defendant again claims that Mr. Matthews cannot establish a prima facie case of discrimination because, while hiring officials are not prohibited by USPS regulations from considering or inquiring into criminal charges pending against any applicant, the USPS does not have a policy of not hiring applicants with arrest records. Finally, the defendant argues that Mr. Matthews has presented no material facts to support a discrimination claim.

The plaintiff responds that he can make a prima facie case of racial discrimination under a disparate treatment theory, and reminds the Court that his burden in such circumstances is not onerous. He then argues that genuine issues of material fact as to Ms. Lang's consideration of arrest and conviction records and her consideration of his employment history at Merco preclude the Court from concluding that no reasonable jury could find in his favor. As to disparate impact, Mr. Matthews claims that, by allowing hiring officers to consider pending criminal charges, USPS regulations permit the selection of applicants based on arrest records, which adversely impacts blacks more than whites. Again, he argues that genuine issues as to Ms. Lang's motives for considering his pending criminal charges precludes summary judgment.

## C. *ANALYSIS:*

As the defendant requests summary judgment, the Court must determine whether a reasonable jury, viewing the factual record in a light most favorable to the plaintiff, would nevertheless be unable to render a verdict in his favor. If a reasonable jury could support such a verdict, then summary judgment for

---

1. Under the 1991 Act, which we saw was inapplicable to this case, both the burden of production and the burden of persuasion shift to the employer in such circumstances. *See, e.g., Fisher v. Transco Services–Milwaukee, Inc.*, 979 F.2d 1239, 1245 n. 4 (7th Cir.1992).

the defendant would be improper. The Seventh Circuit has recognized that disparate treatment and disparate impact theories are not inherently contradictory, and may be brought in the same action. *Reidt v. County of Trempealeau,* 975 F.2d 1336, 1340 n. 4 (7th Cir.1992). To foster expedient resolution, we first turn to the latter.

### 1. *Disparate Impact:*

The plaintiff cannot make out a prima facie case of discrimination under the disparate impact theory of *Wards Cove.* The parties agree that, under §§ 313.331–33 of the USPS Personnel Operations Handbook (EL–331), a hiring officer may not consider previous arrests for criminal charges in employment evaluations. Nor do they dispute that, under §§ 313.341–43 of the handbook, a hiring officer may consider previous convictions for criminal charges in employment evaluations. Nevertheless, to satisfy the first prong of the prima facie case, the plaintiff identifies § 313.334 of the handbook as the specific employment practice challenged in this case. Under § 313.334,

> "[a]ppointing officials are not prohibited from considering or inquiring into criminal charges pending against any applicant at the time the application is considered. If the appointing official receives any records or information where the disposition of a criminal charge is not adequately reflected, or where the charge is still pending, give the applicant an opportunity to explain the surrounding circumstances of the charges and whether the charges have been terminated in the applicant's favor. *Pending criminal charges must not result in the automatic rejection of the applicant.*"

The USPS, then, does have a policy of considering a small subset of arrests in making hiring decisions; those for which criminal charges are pending when the application is being considered. Ms. Lang's purported failure to faithfully adhere to this provision is part of Mr. Matthews' disparate treatment claim; however, to satisfy the second prong of his prima facie case under disparate impact, Mr. Matthews uses statistical evidence of the higher arrest rates among blacks than whites in the Milwaukee area to demonstrate

that § 313.334, as an exception to the "no consideration of a previous arrest" rule, has a disproportionate impact on employment opportunities for blacks.

The plaintiff fails, however, under the third prong of the prima facie case enunciated in *Wards Cove;* the need to establish a "causal link" between the disparate impact and the challenged employment practice. Under *Wards Cove,* after identifying the specific employment practice challenged,

> "[plaintiffs] also have to demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking [ ], specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and nonwhites. To hold otherwise would result in employers being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces.'"

*Id.* at 657, 109 S.Ct. at 2125 (quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 992, 108 S.Ct. 2777, 2787, 101 L.Ed.2d 827 (1988)). Mr. Matthews, however, has not even shown that a racial disparity exists among mail handlers in the USPS, let alone that such divergence was caused by § 313.-334. He has presented no evidence that a lower percentage of blacks are hired or employed as mail handlers than constitute "qualified persons in the relevant labor market" or "otherwise qualified applicants." *Id.* at 650–51, 109 S.Ct. at 2121. In fact, the only example of the application of § 313.334 which has been presented to the Court is that involving Mr. Matthews, in which two of the three available positions were filled by black males. Mr. Matthews' evidence that arrest rates among blacks are higher than those among whites, standing alone, fails to provide the requisite causal link. While this indicates that § 313.334 may affect nonwhites more adversely than whites, it does not show that nonwhites are disproportionately represented in the mail handler ranks of the USPS.

Moreover, even if Mr. Matthews had presented evidence that blacks are disproportionally represented as USPS mail handlers,

**1358**

he has failed to show that such circumstances resulted from USPS policy under § 313.334. If, for example, "the absence of minorities holding such [ ] positions is due to a dearth of qualified nonwhite applicants (for reasons that are not [the defendant's] fault), [the defendant's] selection methods or employment practices cannot be said to have had a 'disparate impact' on nonwhites." *Wards Cove,* 490 U.S. at 651–52, 109 S.Ct. at 2122. As noted in *Wards Cove:*

"One example illustrates why this must be so. [Plaintiffs'] own statistics concerning the noncannary work force at one of the canneries at issue here indicate that approximately 17% of the new hires for medical jobs, and 15% of the new hires for office worker positions, were nonwhite. If it were the case that less than 15 to 17% of the applicants for these jobs were nonwhite and that nonwhites made up a lower percentage of the relevant qualified labor market, it is hard to see how [plaintiffs], without more, cf. *Connecticut v. Teal,* 457 U.S. 440 [102 S.Ct. 2525, 73 L.Ed.2d 130] (1982), would have made out a prima facie case of disparate impact. Yet, under the Court of Appeals' theory, simply because nonwhites comprise 52% of the cannery workers at the cannery in question, [plaintiffs] would be successful in establishing a prima facie case of racial discrimination under Title VII.

Such a result cannot be squared with our cases or with the goals behind the statute. The Court of Appeals' theory, at the very least, would mean that any employer who had a segment of his work force that was—for some reason—racially imbalanced, could be haled into court and forced to engage in the expensive and time-consuming task of defending the 'business necessity' of the methods used to select the other members of his work force. The only practicable option for many employers would be to adopt racial quotas, insuring that no portion of their work forces deviated in racial composition from the other portions thereof; this is a result that Congress expressly rejected in drafting Title VII."

*Id.* at 652, 109 S.Ct. at 2122. As previously indicated, although *Wards Cove* was ultimately looked upon disfavorably by Congress, we must faithfully apply its holdings in this case. Again, Mr. Matthews has presented no evidence to link any purported discrepancies between the percentage of black mail carrier applicants who submit qualified applications and those who are ultimately hired. Assuming such a discrepancy exists, it may result from one of a multitude of factors. Based on arrest statistics, for example, we can safely assume that black applicants are more likely to have been convicted of a criminal offense than white applicants; while § 313.343 of the handbook does not authorize disqualification of an applicant based on a previous criminal conviction,[2] it is clear that a hiring officer is more likely to deem such applicant unsuitable for employment. Other possibilities include variances in employment experience, average age, test scores, and/or acceptance rates. By requiring plaintiffs to establish a "causal link," *Wards Cove* instituted a regime where aggrieved employees would almost always be required to rebut all other potential sources of discrepancy to make a prima facie case. Mr. Matthews has failed, either affirmatively or by implication, to prove causation in this case; and, as previ-

---

2. Section 313.343 reads as follows:

"It is the USPS policy to evaluate the employability of each applicant with a criminal conviction record individually. *The mere fact that an applicant has a criminal conviction record is not sufficient to disqualify that applicant from postal employment. Instead, an applicant should be rejected on the basis of a history of criminal conviction only after a specific finding that the history is directly related to the applicant's present capacity to perform as a Postal Service employee.* To the extent available, such factors as the following must be considered during such an evaluation:

    a. The applicant's age at the time of the offense(s).
    b. The nature of the offense(s) and the underlying circumstances of the offense(s).
    c. Length of time elapsed since the applicant's offense(s).
    d. Evidence of efforts made by the applicant toward rehabilitation, including job training or educational programs in which the applicant may have participated while incarcerated."
(Emphasis added).

ously indicated, his assertion that Ms. Lang denied him employment based on his arrest record is best treated as part of his disparate treatment, not disparate impact, claim. Because no reasonable jury could find that Mr. Matthews established this causal link, the Court must grant summary judgment to the defendant on his disparate impact claim.

## 2. *Disparate Treatment:*

Nor can the plaintiff prevail under his disparate treatment theory of liability. It is clear that neither Ms. Lang nor other officials at the Milwaukee Post Office ever acknowledged that racial animus was behind the employment decisions involving Mr. Matthews. Circumstantial evidence of discriminatory intent is also lacking: the timing of Mr. Matthews' rejection was not suspicious; in two of the three instances where he was considered for employment, he was competing with one white male and one black male, and the black males were hired; while Mr. Matthews charges that Ms. Lang called him a "criminal" with a "felony conviction," neither Ms. Lang nor other USPS hiring employees ever uttered racially-inappropriate remarks; and, even if we adopt Mr. Matthews' conclusion that his criminal history was no different than Mr. Misfeldt, there is no comparative evidence of *systematically* more favorable treatment by Ms. Lang toward white applicants.

To avoid summary judgment, then, the plaintiff must prevail under the burden-shifting approach established by the Supreme Court in *McDonnell Douglas.* Albeit with some difficulty, Mr. Matthews establishes a prima facie case of discrimination under this approach. He clearly belongs to a protected group, and applied for the position at issue. While the parties dispute his credentials vis-a-vis those of Mr. Misfeldt, he was clearly "qualified" for the position of mail handler given his examination score and the fact that, as previously indicated, the USPS Personnel Operations Handbook does not preclude hiring officials from considering applicants with prior or pending criminal convictions. As to the fourth prong of *McDonnell Douglas,* Mr. Matthews was considered three times for such position, and denied employment in each instance. Two vacancies were filled by black males; the third, however, was filled by Mr. Misfeldt, a white male. The third hiring decision by Ms. Lang, then, is the only one that Mr. Matthews can challenge under a theory of disparate treatment. By establishing the four prongs of his prima facie case, Mr. Matthews has earned a rebuttable presumption that the defendant unlawfully discriminated against him subject to the defendant meeting his burden of production.

The defendant has met its burden of production, however, by providing legitimate nondiscriminatory reasons for the employment decisions in this case. As previously indicated, Ms. Lang cites five primary reasons for failing to hire Mr. Matthews; his numerous criminal convictions in comparison with other applicants, their severity, his pending felony charge of endangering safety by use of a dangerous weapon, his spotty employment history, and her concern about protecting the sanctity of the U.S. mail and the safety of USPS employees. Each of these is a source of legitimate concern in bringing on a new employee; collectively, they overwhelmingly state valid nondiscriminatory reasons for hiring Mr. Taylor, Mr. Coney, and Mr. Misfeldt rather than Mr. Matthews. By articulating such reasons, the defendant eradicates the presumption of discrimination and the plaintiff is required to prove that the explanation given is simply a pretext for racially-based decisionmaking.

No reasonable factfinder could conclude that Mr. Matthews has met his burden of proof in this case. Regarding comparative employment histories, he does not dispute that, while Mr. Misfeldt was terminated from a managerial job after eighteen months employment, he was terminated from a nonmanagerial position at Merco after several days, or that Mr. Misfeldt had established an employment history with the USPS as a casual employee. Nor does he contend that, at the time his application was considered, Ms. Lang had received from Merco an evaluation form stating that it would not rehire him. He instead indicates that Merco officials, at his request, notified Ms. Lang nearly one year later, in October of 1990, that he had been fired only after refusing to remove as-

bestos without proper equipment; he also argues that Ms. Lang singled him out at the group interview by denying him an opportunity to explain the circumstances surrounding his dismissal. Neither charge lends any support to his discrimination claim; the former, by indicating that Ms. Lang lacked mitigating information as to his firing, enhances the defendant's position that Mr. Matthews appeared less qualified than Mr. Misfeldt at the time of hiring, while the latter, by showing that every other black applicant received a full-length personal interview, indicates that Mr. Matthews was not singled out based on racial animus.

Nor could a reasonable factfinder conclude that Ms. Lang's consideration of his prior convictions and pending criminal charges at the time of hiring were a pretext for discrimination. Again, Mr. Matthews does not challenge Ms. Lang's consideration of Mr. Misfeldt's 1984 traffic violation as a minor offense unrelated to the position of mail handler. Instead, he challenges her consideration of his three criminal convictions between 1972 and 1983 and his pending misdemeanor and felony convictions as improper and discriminatory in effect based on arrest statistics. Again, neither conclusion is supported by any evidence. The latter, we saw, was insupportable under a theory of disparate impact; the former is equally misplaced. As previously indicated, the USPS Personnel Operations Handbook directs a hiring official to *consider* prior convictions and pending criminal charges in employment decisions; while also requiring such persons to take into account other factors, including the severity and age of the offense, it did not preclude Ms. Lang from considering any such elements of Mr. Matthews' record. Mr. Matthews has simply presented no evidence to indicate that Ms. Lang failed to follow the handbook or considered any impermissible factors, including race, in making her decision. In her estimation, Mr. Matthews' one-point edge over Mr. Misfeldt in examination score was outweighed by his slightly worse employment history and significantly worse criminal record; even if Ms. Lang did, as the plaintiff charges, tell him that he was not hired because he was a "criminal," she simply meant that his criminal record mitigated his examination score sufficiently to place

him behind the hired applicants. At best, the plaintiff charges that Ms. Lang places inordinate weight on an applicant's prior convictions and/or pending criminal charges, a claim clearly not cognizable under Title VII.

As with almost every employment decision, Ms. Lang faced a series of difficult hiring decisions involving Mr. Matthews. In each instance, she applied the provisions of the USPS Personnel Operations Handbook in determining the most qualified applicant. While each of her decisions appears well-founded in the eyes of the Court, we recognize that reasonable jurors could disagree as to her assessments of the most qualified applicants. Any merit-based challenges are appropriately left to administrative and other modes of appeal. However, no reasonable jury could find that the employment decisions involving Mr. Matthews were racially discriminatory under theories of disparate treatment or disparate impact. As a result, summary judgment in favor of the defendant is proper.

### IV. *SUMMARY*

For the foregoing reasons, the Court hereby **GRANTS** the defendant's Motion for Summary Judgment in the above-captioned matter.

**SO ORDERED.**