Gary McKNIGHT, Plaintiff,

v.

## SUPERAMERICA GROUP/ASHLAND OIL COMPANY, Defendant.

### No. 93–C–255.

United States District Court, E.D. Wisconsin.

May 31, 1995.

9. On May 19, 1993, defendants distributed $111,-999.74 to Mrs. Hizer, $11,999.74 of which was for interest.

John S. Williamson, Jr., Appleton, WI, for plaintiff.

Marko J. Mrkonich, William M. Tuttle, Oppenheimer Wolff & Donnelly, St. Paul, MN, for defendant.

### *DECISION AND ORDER*

WARREN, District Judge.

Before the Court is the defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c) ("Rule 56(c)") in the above-captioned matter. For the following reasons, this motion is granted, and this case dismissed.

### I. FINDINGS OF FACT

1. Plaintiff Gary McKnight, a black male, formerly resided at 9105 West Howard Avenue in Greenfield, Wisconsin; he now lives in Jersey City, New Jersey. (Def.Proposed Findings of Fact ¶ 1.)

2. Defendant SuperAmerica Group is a division of Ashland Oil, a Kentucky corporation, and has its principal place of business and corporate headquarters in Lexington, Kentucky; SuperAmerica operates gasoline and convenience stores throughout the South and Upper Midwest. (*Id.* at ¶ 2.)

3. Mr. McKnight was employed by SuperAmerica as a store manager in training from approximately April 30, 1990 through October 17, 1990. (*Id.* at ¶ 3.)

4. Mr. McKnight brings this action pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 2000e et seq. ("Title VII"), and invokes this Court's jurisdiction under 28 U.S.C. § 1331; 42 U.S.C.A. §§ 1981 and 2000e et seq. (*Id.* at ¶ 4.)

5. Although Mr. McKnight no longer resides in the Eastern District of Wisconsin, venue is properly exercised under 28 U.S.C. § 1391(b) because a substantial part of the alleged events giving rise to his claim occurred in this district. (*Id.* at ¶ 5.)

6. In April of 1990, Mr. McKnight submitted his resume to Tim Metcalfe, a zone manager for SuperAmerica, in response to a newspaper advertisement seeking "managers." (*Id.* at ¶ 6.)

7. Mr. McKnight's resume indicated that he had a bachelor's degree in accounting and a master's degree in taxation. (*Id.* at ¶ 7.)

8. Within SuperAmerica's management structure, a zone manager directly supervises approximately four (4) area managers; SuperAmerica had four (4) area managers in the greater Milwaukee area in 1990, and Mr. Metcalfe was the only zone manager. (*Id.* at ¶ 8.)

9. Each SuperAmerica area manager, in turn, directly supervises approximately seven (7) to nine (9) store managers, each of whom is responsible for the day-to-day management of one SuperAmerica gasoline and convenience store. (*Id.* at ¶ 9.)

10. Mr. Metcalfe had authority to hire store managers within his zone; he did not, however, have authority to hire employees in the investments or benefits areas. (*Id.* at ¶ 10.)

11. SuperAmerica has no employees in the benefits or investments areas; individuals performing these functions for SuperAmerica are employed by Ashland Oil. (*Id.* at ¶¶ 11, 13.)

12. According to Mr. McKnight, he told Mr. Metcalfe that he was interested in a position in the financial, investments, mergers and acquisitions, or tax areas, and Mr. Metcalfe told him that it was SuperAmerica's practice to have everyone start out at the store manager position. (*Id.* at ¶ 12.)

13. Mr. McKnight had two interviews with Mr. Metcalfe; by the end of his second interview, on April 30, 1990, Mr. McKnight had been offered and had accepted the position of store manager in training. (*Id.* at ¶ 15.)

14. Most SuperAmerica store managers are initially hired as cashiers or assistant managers, and work their way up to the position of store manager; most SuperAmerica store managers are not college educated. (*Id.* at ¶ 16.)

15. Because Mr. McKnight was much more educated than most SuperAmerica store managers, he received a starting salary of $30,000 per year, at that time the highest possible starting salary for a newly hired store manager. (*Id.* at ¶ 17.)

16. On the day he was hired, Mr. McKnight reviewed a variety of SuperAmerica policies and acknowledged he had done so by initialing the relevant documents. (*Id.* at ¶ 18.)

17. Among the items Mr. McKnight reviewed were SuperAmerica's policies regarding racial harassment and equal employment opportunities. (*Id.* at ¶ 19.)

18. The racial harassment policy provided a telephone number which any SuperAmerica employee could call to report instances of harassment, and was posted in all SuperAmerica stores; Mr. McKnight never called that number to report any instances of harassment during the time he was employed. (*Id.* at ¶ 20.)

19. According to Mr. McKnight, Mr. Metcalfe told him that he would receive training for between six (6) months to a year; Moyez "Mike" Bandani, Mr. McKnight's area manager, claims, however, that a SuperAmerica store manager can generally be taught all his or her responsibilities in three (3) to five (5) months. (*Id.* at ¶¶ 21–22; Pl.Mem.Opp'n Summ.J. at 10.)

20. Mr. McKnight started work on May 2, 1990, and was initially assigned to Store No. 4078, located at 10306 West Greenfield Avenue in West Allis and managed at that time by Tom Licht. (Def.Proposed Findings of Fact ¶ 23.)

21. According to Mr. Bandani, Store No. 4078 was one of the busiest SuperAmerica stores in the Milwaukee area; it is open 24 hours a day, has a delicatessen, and generally requires at least two cashiers and one manager to run the cash registers. (*Id.* at ¶ 24.) [1]

22. The plaintiff indicates that, on his first day of work, he, rather than one of the lower-paid white employees on duty, was required to sweep the station's grounds, and that, later that day, Mr. Licht had a female minority employee sweep the lot; he claims that he never saw any other store manager sweep a lot. (Pl.Mem.Opp'n Summ.J. at 4; Deposition of Gary McKnight, volume 1, at 95–96.)

23. During his time at Store No. 4078, Mr. McKnight was told by a female minority employee that she was being harassed "in terms of [her] assignments, and the way she was being treated and confronted by other employees"; while he "tried to calm the employee down," and encouraged her to discuss the issue with the store manager, he did not report it to SuperAmerica management. (Def.Mem.Supp.Summ.J. at 5 n. 1.)

24. According to Mr. Bandani, he arranged for Mr. McKnight to be transferred to a smaller, less busy store because he felt that Store No. 4078 was an inappropriate store in which to train a newly hired manager. (Def.Proposed Findings of Fact ¶ 24.)

25. Sometime in mid-May of 1990, Mr. McKnight was transferred to Store No. 4181, located at 9200 West Bluemound Road in Milwaukee and managed by Bob Halter. (*Id.* at ¶¶ 25–26; Pl.Mem.Opp'n Summ.J. at 4.)

26. Store No. 4181 had about two-thirds of the sale volume of Store No. 4078. Mr. Halter was instructed to train the plaintiff in all areas of the operation of a SuperAmerica store, including the various functions of each

---

**1.** While the plaintiff contests this, as well as other, proposed findings, he only does so based on "McKnight's deposition, his affidavit, Besaw's affidavit, and Williamson's affidavit," and does not reference any page numbers in those documents to support his position. Because Local Rule 6.05(b)(1) contemplates a more detailed response, we must accept as undisputed any such proposed findings, if adequately supported by the record, unless the plaintiff has presented contrary evidence in the more-detailed statement of facts contained in his brief. *See* Pl.Mem.Opp'n Summ.J. at 3–14.

of the three shifts. (Def.Proposed Findings of Fact ¶ 26.)

27. Mr. McKnight was trained in, and quickly became comfortable in, the operation of a cash register; he learned the various check-out procedures used at the end of each shift, and was trained on how to do cigarette counts. (Def.Mem.Supp.Summ.J. at 6.)

28. According to Mr. Bandani, Mr. Halter reported to him that the plaintiff's training had gone slowly and that he seemed uninterested in learning the job of store manager; nevertheless, Mr. McKnight "repeatedly requested" that he be given his own store to manage. (*Id.*)

29. Mr. McKnight counters that he never told Mr. Bandani or Mr. Halter that he wanted to manage his own store because he felt he needed more training, including further instruction and actual experience in using the Hub System and check-out procedures and in hiring new employees; he states that he told Mr. Bandani that he did not understand why he was being transferred to his own store while he was still in training mode, and that this action was contrary to what Mr. Metcalfe had told him. (Pl.Mem.Opp'n Summ.J. at 4–5.)

30. The plaintiff also indicates that he had gotten along with all of the employees at Store No. 4181 and that there were "no complaints" regarding his performance. (*Id.* at 4.)

31. Mr. McKnight recalls an occasion where, after he instructed an employee named Jeff that Mr. Halter had specifically said not to allow another employee to rent a movie, Jeff told him to mind his own business and that "Bob said I don't have to listen to you." (McKnight Deposition, volume 1, at 33.)

32. On approximately September 8, 1990, the plaintiff was assigned his own store to manage, Store No. 4220, located at 9200 West Burleigh Avenue in Milwaukee. (Def.Proposed Finding of Fact ¶ 28.)

33. Unlike most SuperAmerica stores, Store No. 4220 is open 18, rather than 24, hours a day; it also has the lowest sales volume of any store in Mr. Bandani's area. For these reasons, Mr. Bandani considers this to be the easiest store to manage in his area, and good opportunity for a beginning manager. (*Id.* at ¶¶ 29–31.)

34. Prior to Mr. McKnight's arrival at Store No. 4220, it was being run by an assistant manager, Barry Lehman. (*Id.* at ¶ 32.)

35. Immediately before Mr. McKnight took over as store manager, Mr. Bandani and Mr. Lehman reviewed the store's inventory and paperwork to make sure that the store's records were in proper order. (*Id.*)

36. The plaintiff took over as store manager of Store No. 4220 on September 8, 1990; Mr. Lehman remained as assistant manager for two or three days, and, after helping train Mr. McKnight, apparently was transferred to another store. (*Id.* at ¶ 33; McKnight Deposition, volume 2, at 49, 62.)

37. Mr. McKnight indicates that, when he arrived at Store No. 4220, "a lot of the food shelves were out of order, the store was dirty, the aisles were cluttered, [and] there was a high theft of cigarettes because they had sodas stacked very high ... [and] you couldn't see the cigarette case." (McKnight Deposition, volume 2, at 11; Pl.Mem.Opp'n Summ.J. at 6.)

38. Store No. 4220 was, according to the plaintiff, more "antiquated" than the other stores in which Mr. McKnight had worked; among other things, it "had different things in terms of handling the measure of gas in the pumps and things of that nature," had a different security monitoring system, and no full-time employees. (McKnight Deposition, volume 2, at 8, 38, and 48–49; Pl.Mem.Opp'n Summ.J. at 6.)

39. Mr. Bandani telephoned Mr. McKnight and/or stopped in the store for five (5) to ten (10) minute visits at least several times over the next few days; while he claims that he was told that everything was going fine, Mr. McKnight claims that he "repeatedly told [Mr. Bandani] of the problems caused by the lack of an assistant manager and inadequate staffing but he never offered assistance." (Def.Proposed Findings of Fact ¶ 34; McKnight Affidavit ¶ 13.)

40. On approximately September 12, 1990, Mr. Bandani, in the course of his regular supervisory activity, visited Store No. 4220. (Def.Proposed Findings of Fact ¶ 35.)

41. According to Mr. Bandani, it became clear as he spoke with Mr. McKnight that the store was not being managed properly. (*Id.*)

42. When Mr. Bandani asked to see the paperwork that had been completed since September 8, Mr. McKnight produced a stack of difficult-to-decipher handwritten notes written on the back of miscellaneous sheets of scratch paper; he had not used the standard business forms provided by SuperAmerica to complete such paperwork. (*Id.* at ¶ 36.)

43. According to Mr. Bandani, when he confronted the plaintiff about his failure to properly complete the paperwork, the plaintiff raised his voice, pointed his finger in Mr. Bandani's face, and invaded his "personal space"; as a result, Mr. Bandani gave the plaintiff a written unsatisfactory performance/policy violation report, citing him for insubordination and failure to do the proper paperwork. (*Id.* at ¶ 37.)

44. According to Mr. McKnight, Mr. Bandani got upset with him after he had hired an employee without completing the proper paperwork, which Mr. Lehman had promised to complete the next day; while he "spoke firmly" to make clear to Mr. Bandani that any "effort to hold him responsible for the store's problems were unjustified," he did not point his finger in Mr. Bandani's face or invade his "personal space." (Pl.Mem.Opp'n Summ.J. at 7–8; McKnight Deposition, volume 2, at 15, 66.)

45. After this incident, Mr. Bandani removed Mr. McKnight as store manager, and on September 13, 1990, brought in three other store managers, Mr. Halter, Bill Nyback, and Renee Quimette, to review Store No. 4220. (Def.Proposed Findings of Fact ¶¶ 38–39.)

46. According to Mr. Bandani, the three managers concluded, *inter alia*, that Store No. 4220 had suffered significant cash and inventory shortages, that markup and markdowns had not been posted, that gas deliveries had not been posted, that invoices had not been posted, that security store tapes had not been changed, that a new employee had been hired without the completion of any of the necessary paperwork, that lottery tickets had not been balanced, that the sales book had not been completed, that a good employee had requested to be transferred, and that inventory had not been properly ordered or stocked. (*Id.* at ¶ 40.)

47. Mr. McKnight indicates that the store was having "significant" inventory and theft problems even before he arrived, and that, while 387 packs of cigarettes (or approximately 75 per day) were found to be missing during his five-day management tenure, 492 packages (or approximately 70 per day) had disappeared during the seven-day period preceding his arrival. (Pl.Mem.Opp'n Summ.J. at 5.)

48. He also claims that Mr. Bandani "deviated from SuperAmerica's practice" by reassigning Mr. Lehman and leaving him with no assistant manager, thereby making it "extremely unlikely" that he, or even a more experienced manager, could have made a successful transition to store manager. (*Id.* at 6–7.)

49. Mr. McKnight claims that he properly changed the gas prices at the store; he also claims that, while he was delegating the job of doing cigarette counts, he would follow up, make notes on scratch paper, and entering them on the proper forms. (McKnight Deposition, volume 2, at 16–18.)

50. The plaintiff indicates that one daily report was not completed "because the checkout was not done by the employee who did not show up to work on a Sunday;" that there were overages, rather than a $900 cash loss, during his first three days; that Mr. Lehman, rather than he, failed to enter the Hub City order and a few other invoices; and that, on one occasion, he did not enter invoices directly into the computer because he was understaffed. (*Id.* at 17–19.)

51. Mr. McKnight further indicates that, because the attendance of his part-time employees was bad, he hired a new employee, even though he had not been instructed on how to do so; while Mr. Lehman "had indi-

cated that he was going to take care of the paperwork," he did not do so prior to being transferred, and Mr. Bandani showed up the same day that this employee started work and just as Mr. McKnight was "following up" on her paperwork. (*Id.* at 20–22; 50–51.)

52. Mr. McKnight does not recall whether he posted markdowns, gas deliveries, or certain invoices at Store No. 4220; he states that, while the store was understaffed, he posted invoices "to the best of [his] ability on a daily basis when [he] was in the position to do so." (*Id.* at 46–48; Def.Proposed Findings of Fact ¶ 42.)

53. Mr. McKnight indicates that, while he had not been trained on changing security tapes, other employees at the store, including Mr. Lehman, had changed them periodically. (McKnight Deposition, volume 2, at 49.)

54. According to the plaintiff, while he observed the daily counting and balancing of lottery and lotto tickets one time at Store No. 4181, he was never "shown all of these things a second time," and did not perform these functions at Store No. 4220 because he was told that an employee would handle it. (*Id.* at 51–52; Def.Proposed Findings of Fact ¶ 43.)

55. Mr. McKnight recalls being told that one of his employees "who had a chronic attendance problem, who was coming in late often, was fired by the previous manager who ran that store and then rehired as a transfer to another store." (McKnight Deposition, volume 2, at 53.)

56. Managers Halter, Nyback and Quimette concluded that Store No. 4220 had in excess of 11,000 gallons of gas fluctuations because gas deliveries had not been posted; Mr. McKnight challenges this volume based on the affidavit of Jean Besaw, a former manager of a SuperAmerica Store in Neenah, Wisconsin. (*Id.* at 54; Pl.Mem.Opp'n Summ.J. at 8–9.)

57. Mr. McKnight had observed others making Hub City orders at Store No. 4181 and completing sales books; according to him, Store No. 4220 ran out of 2% milk on September 11 because Mr. Lehman did not order enough the previous week and the store experienced increased sales volume the

week he was there, and the sales books were to be completed by other employees. (McKnight Deposition, volume 2, at 54–57.)

58. Mr. McKnight had observed others complete bank deposit tickets at Store No. 4181, and had filled them out himself on at least one occasion; Mr. Bandani's affidavit includes an exhibit showing that the bank had to correct multiple deposits made from Store No. 4220 while it was managed by the plaintiff. (*Id.* at 58–59.)

59. Mr. McKnight indicates that he made improvements to the exterior and interior appearance of the store, including changing displays, increasing orderliness, and enhancing customer service; he also indicates that he suffered a serious back injury during his time at the store. (*Id.* at 57–58; Pl.Mem. Opp'n Summ.J. at 6–7.)

60. After removing Mr. McKnight from Store No. 4220, Mr. Bandani placed him on 30 days probation; he was given a written report outlining the terms of his probation, including his transfer to Store No. 4123, located at 8431 West Appleton Avenue in Milwaukee and managed by Ron Yencheske, to receive additional training. (Def.Proposed Findings of Fact ¶¶ 44–46.)

61. Pursuant to the terms of his probation, Mr. McKnight was instructed to improve his ability to complete various tasks, including paperwork, gas surveys, ordering, cigarette counting, deposit tickets, hiring and selecting employees, security procedures, store maintenance, payroll and bank procedures, register operations, and general operational procedures. (*Id.* at ¶ 47.)

62. The plaintiff was informed in writing that his performance would be reviewed at regular intervals during his probationary period, and that if his performance had not improved to a satisfactory level by the end of the probationary period, he would be disciplined and/or terminated. (*Id.* at ¶ 48.)

63. Mr. McKnight acknowledged receiving the written probation report, although he disagreed with the decision to put him on probation. (Bandani Aff., Ex. 12.)

64. Mr. Bandani considered Mr. Yencheske to be a good store manager and train-

er of employees; while Mr. Bandani indicates that he did not inform him of Mr. McKnight's circumstances, only telling him that he was being assigned a new manager in training, Mr. McKnight claims that Mr. Yencheske told him that Mr. Bandani had so informed him. (*Id.* at ¶¶ 35–36; McKnight Aff. ¶ 5; Def.Proposed Findings of Fact ¶ 49.)

65. In training Mr. McKnight, Mr. Yencheske used a training log, which set forth several procedures for the plaintiff to learn each day; after learning each procedure, Mr. McKnight was to acknowledge that he had done so by initialing the training log. (*Id.* at ¶ 50.)

66. According to the defendant, Mr. McKnight received additional training on all store manager duties from September 19 through September 28 and acknowledged this by initialing each line on the training log. (*Id.* at ¶ 51.)

67. According to the plaintiff, Mr. Yencheske was very abrasive, and rushed him through each procedure and pressured him to initial the training log without giving him adequate time to "understand the differences in the different facilities." (McKnight Deposition, volume 1, at 46–47 and volume 2, at 79; Pl.Mem.Opp'n Summ.J. at 12–13; McKnight Aff. ¶ 7.)

68. Mr. Yencheske never refused a request from Mr. McKnight for additional training. (McKnight Deposition, volume 2, at 79.)

69. The goal of these ten days of additional training was for Mr. McKnight to run Store No. 4123 by himself, with Mr. Yencheske observing to make sure everything was going alright. (Def.Proposed Findings of Fact ¶ 52.)

70. According to Mr. McKnight, Mr. Bandani unduly criticized him, but not Mr. Yencheske, for little things that hadn't been done at the store, and Mr. Yencheske unfairly criticized him and attempted to provoke him by demanding that he complete the daily entries after he had momentarily stopped filling them out, as was common, to assist the person at the checkout counter. (McKnight Deposition, volume 1, at 48–49.)

71. Mr. McKnight indicates that Mr. Yencheske treated him less favorably than the white assistant manager at the store, Mark, on at least two occasions. (Pl.Mem.Opp'n Summ.J. at 13.)

72. When, on one occasion, Mark accumulated more than $100 in his cash register and failed to place it in the dropbox, Mr. Yencheske said nothing; however, when Mr. McKnight had failed to immediately place $20 in the dropbox while making change during a busy time, Mr. Yencheske criticized him in front of the customer. (*Id.*)

73. On another occasion, Mark was not criticized for coming in an hour-and-a-half (1½) late; however, when Mr. McKnight arrived at work 20 seconds late because he had been out taking gas surveys in the rain and had been waiting in his car in the parking lot for the rain to stop, Mr. Yencheske angrily berated him. (*Id.*)

74. The plaintiff contacted Mr. Metcalfe by telephone and by letter, requesting that he come to Store No. 4123 or that he transfer Mr. McKnight to be trained by another manager; he claims that Mr. Metcalfe was hostile towards him and refused. (*Id.*; McKnight Deposition, volume 2, at 88–89; McKnight Aff. ¶ 10.)

75. Mr. Yencheske completed four (4) weekly written performance evaluations of Mr. McKnight's work; each indicates that Mr. Yencheske felt that Mr. McKnight's performance was unsatisfactory. (Def.Proposed Findings of Fact ¶¶ 53–54.)

76. On October 17, 1990, at the end of the plaintiff's probationary period and after consulting Mr. Bandani and Ron Goette, SuperAmerica's human resource manager, Mr. Metcalfe terminated the plaintiff; later that day, the plaintiff contacted Mr. Goette and stated that he felt the termination was unfair. (*Id.* at ¶ 55–56.)

77. During the time he was employed at SuperAmerica, Mr. McKnight never heard any SuperAmerica employee or representative use any racially derogatory names or terms. (*Id.* at ¶ 58.)

78. In a workers' compensation claim, the plaintiff alleged that he had been injured at work on two separate occasions and that he

was terminated as a result of filing this claim; after a contested hearing, the administrative law judge denied his termination claim, finding that he had been terminated for unsatisfactory performance. (Def.Mem.Supp.Summ.J. at 12.)

79. On October 15, 1990, two days before his termination, Mr. McKnight filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"); in that charge, he alleged that he was subjected to harassment from white co-workers, not provided with the same training as similarly-situated white managers, and that Mr. Yencheske had criticized his work performance without good reason. (Def.Proposed Findings of Fact ¶ 59.)

80. On September 16, 1992, he amended his charge of discrimination to include claims that he was terminated in retaliation for filing his EEOC charge and that his hiring was discriminatory regarding his wages and the denial of hiring into a higher position. (*Id.* at ¶ 60.)

81. On December 10, 1992, the EEOC issued its determination, concluding that there was no probable cause to believe that Mr. McKnight had been discriminated against regarding his hiring, the terms and conditions of his employment, or his termination. (*Id.* at ¶ 61.)

## II. STANDARD OF REVIEW

Under Rule 56(b), a party defending a lawsuit "may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Rule 56(c), in turn, deems summary judgment appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue of fact exists only where a reasonable jury could make a finding in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Santiago v. Lane,* 894

F.2d 218, 221 (7th Cir.1990). An issue of fact must also be material, as "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. *See also Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992); *Local 1545, United Mine Workers of Am. v. Inland Steel Coal Co.,* 876 F.2d 1288, 1293 (7th Cir.1989). The presence of a genuine issue of material fact is to be determined by the substantive law controlling that case or issue. *Anderson,* 477 U.S. at 254–55, 106 S.Ct. at 2513; *Santiago,* 894 F.2d at 221. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine need for trial and summary judgment is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Local 1545,* 876 F.2d at 1292. Once this burden is met, the non-moving party must "go beyond the pleadings" and designate specific facts to support each element of its cause of action, showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552; *Local 1545,* 876 F.2d at 1293. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Koclanakis v. Merrimack Mut. Fire Ins. Co.,* 899 F.2d 673, 675 (7th Cir.1990), or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir. 1985), and both parties must produce proper documentary evidence to support their contentions. *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990); *Local 1545,* 876 F.2d at 1293. In deciding a summary judgment motion, the Court must view the record in a light most favorable to the non-moving party, and all reasonable inferences shall be drawn in that party's favor. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Santiago,* 894

F.2d at 221. A court need not draw every inference from the record, only reasonable inferences. *Local 1545*, 876 F.2d at 1292–93; *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir.1989).

### III. DISCUSSION

#### A. Parties' Arguments:

According to the defendant, the plaintiff's § 1981 claim and Title VII claims, to the extent that they are based on wrongful termination, are barred under the doctrine of collateral estoppel because "[t]he reason for McKnight's termination has been finally adjudicated in another matter involving the same parties." SuperAmerica also argues that, because Mr. McKnight was hired for the job for which he applied, he cannot legitimately advance a discriminatory hiring claim in this case. The defendant further claims that, because the conduct at issue in this case occurred prior to the effective date of the Civil Rights Act of 1991, Mr. McKnight's harassment, retaliation, and termination claims are not cognizable under § 1981. And while acknowledging that these claims may be brought under Title VII, SuperAmerica argues that it is entitled to summary judgment because Mr. McKnight cannot establish that he was performing satisfactorily or that his termination was a pretext for racial discrimination.

The plaintiff responds that collateral estoppel cannot be used to preclude his termination claim based on unreviewed state administrative findings. He also claims that the defendant cannot defeat his prima facie case by simply arguing that he performed inadequately; according to the plaintiff, SuperAmerica has wrongfully "attempt[ed] to make disproof of *its* case part of the proof necessary for McKnight to make a prima facie case." Finally, Mr. McKnight argues that he has met his prima facie case by showing that SuperAmerica inadequately trained him, prematurely assigned him to manage his own store without providing adequate support to "build a pretext for discharging him," and then "reassigned him to a supervisor hostile to blacks." He agrees with the defendant, however, that "his 42 U.S.C. § 1981 claims and 42 U.S.C. Title VII claims relating to hiring should be dismissed."

#### B. Legal Standard:

##### 1. *42 U.S.C. § 1981:*

■ Section 1981 of Title 42 of the United States Code reads as follows:

"(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

42 U.S.C. § 1981. Subsections (b) and (c) were added to § 1981 with the November 21, 1991 passage of the Civil Rights Act of 1991 ("1991 Act"), *see* Pub.L. No. 102–166, Title I, § 101, 105 Stat. 1071, and became effective that same day. Pub.L. No. 102–166, Title IV, § 402, 105 Stat. 1099.

In *Rivers v. Roadway Express, Inc.*, —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994), the Supreme Court held that, because subsections (b) and (c) "create[ ] liabilities that had no legal existence before the Act was passed," they are not to be applied retroactively to discriminatory conduct which occurred prior to the effective date of the 1991 Act. *Id.* —— U.S. at —— – ——, 114 S.Ct. at 1519–20. As a result, pre–1991 Act law must be applied in any case where the discriminatory behavior alleged predates November 21, 1991.

■ "The principle that statutes operate only prospectively, while judicial decisions

operate retrospectively, is familiar to every law student." *Id.* —— U.S. at ——, 114 S.Ct. at 1519 (*quoting United States v. Security Indus. Bank,* 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982)). Pursuant to this rule, the Supreme Court decision in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1988), "provides the authoritative interpretation of the phrase 'make and enforce contracts' " in [§ 1981] for *all* cases arising before passage of the 1991 Act even though that decision is generally regarded as narrowing the previously-understood scope of § 1981. *Id.* —— U.S. at —— – ——, 114 S.Ct. at 1516–18. In *Patterson,* the Supreme Court observed:

"... The most obvious feature of [pre-amended § 1981] is the restriction of its scope to forbidding discrimination in the 'mak[ing] and enforce[ment]' of contracts alone. Where an alleged act of discrimination does not involve the impairment of one of these specific rights, § 1981 provides no relief. Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts.

By its plain terms, the relevant provision in § 1981 protects two rights: 'the same right ... to make ... contracts' and 'the same rights ... to ... enforce contracts.' The first of these protections extends only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment. The statute prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms. But the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions. Such postformation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment, mat-

ters more naturally governed by state contract law and Title VII.

The second of these guarantees, 'the same right ... to ... enforce contracts ... as is enjoyed by white citizens,' embraces protection of a legal process, and of a right of access to legal process, that will address and resolve contract-law claims without regard to race. In this respect, it prohibits discrimination that infects the legal process in ways that prevent one from enforcing contract rights, by reason of his or her race, and this is so whether this discrimination is attributed to a statute or simply to existing practices ... The right to enforce contracts does not, however, extend beyond conduct by an employer which impairs an employee's ability to enforce through legal process his or her established contract rights."

*Patterson,* 491 U.S. at 176–78, 109 S.Ct. at 2372–73 (citations omitted) (finding that racial harassment claim against employer involved a "condition of employment," rather than the making or enforcement of a contract, and was therefore not actionable under § 1981). Subsections (b) and (c) were enacted in response to the Supreme Court's narrowing of § 1981 in *Patterson. See Rivers,* —— U.S. at ——, 114 S.Ct. at 1516; *Landgraf v. USI Film Products,* —— U.S. ——, ——, 114 S.Ct. 1483, 1489, 128 L.Ed.2d 229 (1994). Nevertheless, *Patterson* remains as the legal standard to be applied to all discriminatory conduct claims occurring prior to November 21, 1991. *Rivers,* —— U.S. at ——, 114 S.Ct. at 1519.

2. *Burden-shifting in summary judgment under McDonnell Douglas:*

 To prove discriminatory behavior by the defendant in this case, the plaintiff must show that its decisions were based on "the impermissible consideration of race, i.e., that a person of another race would not also have [been subjected to the same treatment] under similar circumstances." *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1112 (7th Cir.1992) (Title VII case). In discrimination cases such as this "where the disparate treatment of a single employee is at issue, a plaintiff can either produce direct or indirect evidence of discrimination." *Kirk v. Federal*

*Property Management Corp.*, 22 F.3d 135, 138 (7th Cir.1994) (Title VII case); *Rush*, 966 F.2d at 1113. Direct evidence of discrimination, of course, includes any acknowledgement by the defendant that discriminatory intent was behind its treatment of the plaintiff; circumstantial evidence, including suspicious timing, inappropriate remarks, and "comparative evidence of systematically more favorable treatment toward similarly situated employees not sharing the protected characteristic," may also be used to establish intentional discrimination. *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir.1994) (Title VII case). *Accord Troupe v. The May Department Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994) (Title VII case).

██ Given the "substantial difficulty of obtaining 'direct evidence' of discrimination, [however,] plaintiffs in the vast majority of cases resort to the 'indirect' method" of proof. *Rush*, 966 F.2d at 1113. The indirect method, in turn, involves the burden-shifting approach established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see, e.g., Kirk*, 22 F.3d at 138. Although *McDonnell Douglas* and its progeny involved Title VII claims, its burden-shifting approach has been deemed equally applicable to claims of racial discrimination brought under § 1981. *See, e.g., Patterson*, 491 U.S. at 186, 109 S.Ct. at 2377–78; *Rush*, 966 F.2d at 1113 n. 34.

██ Under this method, a plaintiff alleging discriminatory treatment or discharge must first establish a prima facie case of discrimination by showing that (1) s/he belongs to a protected group, (2) his or her job performance was satisfactory, (3) s/he suffered an adverse employment action, and (4) his or her employer treated similarly-situated employees outside his or her classification more favorably. *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1132 (7th Cir.1994) (Title VII case). *See also Andriakos v. University of Southern Indiana*, 19 F.3d 21 (7th Cir.1994) (Title IX case citing *McDonnell Douglas*, 411 U.S. at 802 & nn. 13–14, 93 S.Ct. at 1824 & nn. 13–14); *Rush*, 966 F.2d at 1113–14. The plaintiff must prove his or her prima facie case by a preponderance of the evidence. *Burdine*, 450 U.S. at 252, 101 S.Ct. at 1093; *Kirk*, 22 F.3d at 138. Upon proving such a case, a presumption is created that the employer unlawfully discriminated against the plaintiff. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Loyd*, 25 F.3d at 522.

██ Once the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant, who must produce some legitimate nondiscriminatory reasons for the challenged employment decision. *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, —— – ——, 113 S.Ct. 2742, 2747–50, 125 L.Ed.2d 407 (1993); *Burdine*, 450 U.S. at 252, 101 S.Ct. at 1093; *Kirk*, 22 F.3d at 138. To meet this standard, the explanation given by the defendant "must be legally sufficient to justify a [favorable] judgment." *Kirk*, 22 F.3d at 138. If the defendant produces no evidence to support a nondiscriminatory basis for acting, the presumption raised by the prima facie case, like any other legal presumption, stands unrebutted and entitles the plaintiff to judgment as a matter of law. *Hicks*, —— U.S. at ——, 113 S.Ct. at 2748; *Loyd*, 25 F.3d at 522.

██ If, on the other hand, the defendant produces legitimate nondiscriminatory reasons for its decision, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that such reasons were a pretext for discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94; *Kirk*, 22 F.3d at 138. "In trying to establish a basis that an employer's explanation was merely pretextual, an employee must 'focus on the specific reasons advanced by the defendant to support the discharge,'" rebutting them by direct evidence or by showing that they have no basis in fact, are not the "real" reason for failure to hire, or are insufficient to warrant such decision. *Lenoir*, 13 F.3d at 1133 (citing *Smith v. Gen. Scanning, Inc.*, 876 F.2d 1315, 1319 (7th Cir.1989), and *Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1220–21 and 1223 (7th Cir.1991)). Once the defendant produces legitimate nondiscriminatory reasons for its decision, the plaintiff must still "carry his ultimate burden

of persuasion—to prove by a preponderance of the evidence that an illegal motive was at work," even if the finder of fact rejects the reasons proffered by the defendant. *Loyd,* 25 F.3d at 522. *See also Hicks,* —— U.S. at ——, 113 S.Ct. at 2748; *Kirk,* 22 F.3d at 138 (citing *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095). As stated in *Loyd:*

> "[t]he trier of fact *may* infer intentional discrimination from its disbelief of the reasons put forward by the defendant and the elements of the prima facie case alone but is not *required* to do so. The presumption is rebutted by the production, not persuasiveness, of evidence of a nondiscriminatory explanation, and *qua* presumption, it drops from the case."

*Id.* at 522 (citations omitted).

**C. Analysis:**

**1. *Section 1981:***

 Mr. McKnight was hired by SuperAmerica on April 30, 1990, and was terminated on October 17 of that year. Because this period predates November 21, 1991, the effective date of the 1991 Civil Rights Act, the pre-amended version of § 1981 governs this case. Under *Patterson,* only the plaintiff's discriminatory hiring claim is cognizable under pre-amended § 1981; his allegations of discriminatory harassment, termination, and retaliation may not be brought under this provision because they do not involve the "making or enforcement" of a contract as understood at that time. Because the plaintiff, in his brief, retracted his discriminatory hiring claim, there exists no basis to support any recovery under § 1981; as a result, summary judgment is properly awarded to the defendant as to each of the plaintiff's claims to the extent that they are bought as § 1981 causes of action.

**2. *Title VII and McDonnell Douglas:***

 In order to grant summary judgment to the defendant as to any of the plaintiff's claims, the Court must be satisfied that a reasonable jury viewing the factual record in a light most favorable to Mr. McKnight would nevertheless be unable to render a verdict in his favor. If a reasonable jury could support such a verdict, then a grant of summary judgment in favor of SuperAmerica on that claim would be improper. As previously indicated, the plaintiff has abandoned his discriminatory hiring claim; therefore, only assertions of discriminatory harassment, retaliation, and termination remain. After careful consideration of the evidence provided by the parties, it is the Court's conclusion that SuperAmerica is entitled to summary judgment on each of these claims.

 In this case, as with most Title VII cases, there exists no direct evidence of discrimination; the only circumstantial evidence involves Mr. McKnight's claim that his performance was unduly criticized by Mr. Yencheske and Mr. Bandani. To establish his claims, then, he relies on the indirect method of proof and burden-shifting rules of *McDonnell Douglas.* As previously indicated, it is the plaintiff's initial burden of proof under this approach to establish a prima facie case of discrimination; to do this, he must show that (1) he is a member of a protected group; (2) his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) SuperAmerica treated similarly-situated employees outside his group classification more favorably. *Lenoir,* 13 F.3d at 1132. The parties agree that Mr. McKnight has established the first and third elements; they dispute, however, whether he met his employer's legitimate job expectations as he progressed through management training, and whether similarly-situated white prospective managers received the same treatment as he did.

Viewing the evidence in a light most favorable to the plaintiff, it is the Court's belief that Mr. McKnight has not adequately established the remaining elements necessary to meet his prima facie case. As to the second element, Mr. McKnight relies almost exclusively on his own subjective opinion of his performance to argue that he functioned satisfactorily as a manager in training.[2] While

---

**2.** While the plaintiff provides an affidavit from Jean Besaw, a former SuperAmerica store manager in Neenah, Wisconsin, which is over one and one-half hours north of Milwaukee, to buttress his claims, Ms. Besaw neither observed his performance nor worked within Mr. Bandani's

his assessment is no doubt relevant and important, it nevertheless remains only one factor to be balanced with the opinions rendered by other SuperAmerica managers in a position to evaluate his performance; and it is clear from the evidence that these managers universally found his performance to be unsatisfactory. Mr. Licht, his first supervising store manager, only worked with the plaintiff for several weeks and apparently was never asked to critique his performance; Mr. Halter, his second supervising store manager, told Mr. Bandani that his training had progressed slowly and that he seemed uninterested in becoming a store manager. Mr. Bandani, as well as Mr. Halter and two other store managers who reviewed the plaintiff's performance at Store No. 4220, concluded that numerous administrative functions at the store had not been properly completed during his week as manager. Mr. Yencheske, of course, graded the plaintiff's performance as unsatisfactory in at least four (4) separate written employee reviews. In sum, at least five (5) experienced managers expressed varying degrees of dissatisfaction with the plaintiff's receptiveness to training and/or ability to function as store manager.

The essence of the plaintiff's claim is that he was inadequately trained by Mr. Licht, Mr. Halter, and Mr. Yencheske, and that he performed as well as any other manager with the same level degree of training would have under similar circumstances. After careful consideration, we believe that no reasonable jury could agree. As previously indicated, the plaintiff performed inadequately if he failed to meet his employer's legitimate job expectations. As an initial matter, he had received four months of training prior to being assigned at Store No. 4220; while he admittedly may not have been overly-familiar with (although he was certainly exposed to) monthly reports, he clearly, by his own admission, had observed and performed daily and weekly paperwork, including posting cash receipts and inventory levels, markups and markdowns, gas deliveries and invoices, inventory orders, lottery ticket sales, and sales book figures. As a result, he was aware that these tasks were to be completed on standard forms, and not on scratch paper, and to be done regularly and in a timely fashion.

For the most part, Mr. McKnight attributes the failure of paperwork being completed at Store No. 4220 to problems with understaffing, the transfer of his assistant manager, and omissions by other employees. These explanations, however, are not persuasive. The plaintiff was clearly expected to know how to complete these tasks himself and, as store manager, was responsible for making sure that they were being properly done by either himself or other employees. The evidence establishes that Mr. McKnight failed on both counts. While he argues that he told Mr. Bandani of his staffing problem, there is no indication that Mr. Bandani was ever informed that these difficulties were causing him to neglect important paperwork duties. Nor did he call Mr. Halter or Mr. Licht with any questions as to the proper procedure in completing these tasks. Mr. McKnight's performance was certainly not all bad; he apparently improved the interior and exterior appearance of the store, worked on improving customer relations, and did not worsen an inherited cigarette theft problem. Nevertheless, as store manager, he was responsible for the implementation and performance of proper sales and accounting procedures. He cannot dodge this responsibility by blaming failures and omissions on other employees; as manager, it was his responsibility to make sure that these tasks were being completed and alert his superiors if they were not. A reasonable jury could only conclude that he failed to do so, and that this failure constituted deficient performance.

Similarly, no reasonable jury could find that the plaintiff met his employer's legitimate job expectations during the time he was being trained by Mr. Yencheske. Mr. McKnight acknowledges that he initialed Mr. Yencheske's training log as they reviewed each procedure; while he now argues that he was pressured into doing so and was "rushed" through this supplemental training,

area of management. As a result, her opinions carry little weight with respect to the matters

being addressed in this case.

he made no such claims at that time and, in fact, by his own admission made no request for additional training. Not only do these facts, coupled with the series of unsatisfactory performance reviews the plaintiff received during this time, strongly support the defendant's position that Mr. McKnight did not satisfactorily function as a store manager at Store No. 4220, they also suggest that, even after over five (5) months of training, he had not yet mastered the knowledge and techniques needed to function effectively as a manager at any SuperAmerica store. In his brief, the plaintiff blames his difficulties in training on Mr. Yencheske, claiming that Mr. Yencheske criticized his performance in an effort to please Mr. Bandani. It may well be that the plaintiff and Mr. Yencheske had a personality conflict; however, it cannot be seriously questioned that his performance during remedial training did not progress satisfactorily, and that he did not reach the ability level reasonably expected of a manager in training with five months experience. And while Mr. McKnight may have found Mr. Yencheske to be "abrasive," the Court is aware of very few new hires who are permitted to select the individual who will train them. As long as Mr. Bandani was satisfied with Mr. Yencheske's abilities, the plaintiff, as would any other employee, had to play the cards that were dealt to him; because he did so unsatisfactorily, no reasonable jury could find that he has met his prima facie case.

The plaintiff has likewise failed to meet the fourth prong of his prima facie case as no reasonable jury could find, based on the facts presented, that SuperAmerica treated similarly-situated white employees any differently than he. Mr. McKnight acknowledges that he has no idea whether Mr. Bandani or any of the other store or area managers ever critiqued the performance of any other manager trainee, black or white, more or less stringently than his own. There is nothing in the record to indicate that, had he been white, Mr. Bandani would not have assigned him to Store No. 4220 after four months of training. And even assuming, as the plaintiff claims, that his performance difficulties at Store No. 4220 were primarily caused by understaffing, inadequate training, and the transfer of his assistant manager, he has

presented no evidence suggesting that, under similar circumstances, Mr. Bandani would not have placed him on probation had he been white. While the plaintiff in his brief attributes racial motives to Mr. Bandani's decisions, there is absolutely no proof, by way of overt statements or comparative conduct, that Mr. Bandani targeted Mr. McKnight or impressed higher expectations on him because of his race.

Indeed, there existed no incentive for anyone at SuperAmerica to disparately treat the plaintiff. At his time of hire, Mr. McKnight was a highly desirable managerial candidate, as he had earned a masters degree and aspired to move up to a financial management position; these factors no doubt contributed significantly to SuperAmerica's decision to start him at $30,000 per year, the highest pay level for his position. SuperAmerica then invested four (4) months of training in him before assigning him to his first store; it defies logic to think that, as argued by the plaintiff, the defendant would have expended such time and money in Mr. McKnight's development in order to "set him up" by "creating a situation that would make it possible to disparage him and build a pretext for discharging him." We recognize, of course, that unlawful discrimination, by definition, involves employers making illogical and unreasonable decisions. Nevertheless, few such employers would, as charged by the plaintiff, spend nearly half a year devising and implementing an elaborate scheme to terminate an employee while paying that employee at the maximum rate and offering lengthy training simply to throw off suspicion.

The plaintiff's "examples" of instances in which he was disparately treated by Mr. Yencheske are unavailing because he does not compare himself to a "similarly situated" employee. Mr. McKnight claims that he, but not a white assistant manager, was criticized by Mr. Yencheske for reporting to work late and for failing to promptly deposit excess money from the cash register into a drop box. Even assuming this is true, however, there is nothing inappropriate with holding a trainee manager to a higher standard than an experienced assistant manager or other

lower-level employee. As a store manager, Mr. McKnight would be solely responsible for implementing SuperAmerica policies and procedures throughout his workforce; this would obviously require that he be much more familiar (and committed) to such practices than other employees. Moreover, a manager sets the standard of conduct to which other employees are to adhere; a lower-level employee can hardly be expected to respond and adhere to the instructions of a manager who is unwilling or unable to conduct himself in a similar manner. Mr. McKnight, then, cannot analogize his treatment with that of an assistant manager because, as a trainee manager, he was not similarly situated; his conduct could rightfully be subjected to a higher degree of scrutiny, especially when he was on probationary status. The plaintiff has presented no evidence to show that a white probationary trainee manager would have been treated any differently than he. As a result, he has not met his prima facie case, and summary judgment in favor of the defendant is again appropriate.[3]

## IV. SUMMARY

For the foregoing reasons, IT IS HEREBY ORDERED that the defendant's Motion for Summary Judgment pursuant to Rule 56(c) be GRANTED in the above-captioned matter, and that this case be DISMISSED forthwith.

**SO ORDERED.**

---

**3.** Because we have found summary judgment appropriate on this basis, we need not address whether the plaintiff's discriminatory termination claim is barred by the doctrine of collateral estoppel.