**Jonathan ONUORAH, Plaintiff,**

v.

**KMART CORPORATION, Defendant.**

**No. IP 97–1675–C–B/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 9, 1999.

Gregory A. Stowers, Stowers Weddle & Henn, Indianapolis, IN, for Plaintiff.

Jim A. O'Neal, Ice Miller Donadio & Ryan, Indianapolis, IN, for Defendant.

## ENTRY GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiff Jonathan Onuorah (Onuorah) sued his former employer, Kmart Corporation (Kmart), on grounds that Kmart discriminated against him on the basis of his race, national origin, and disability. Kmart moved for summary judgment on all claims. As recorded in an Entry dated August 11, 1999, Onuorah stipulated at a status conference before Magistrate Judge V. Sue Shields that he would proceed only with his claim that Kmart failed to rehire him due to his race/national origin. However, when he filed his response to Kmart's summary judgment motion *after* the status conference, Onuorah referred to "discrimination claims under ... the Americans with Disabilities Act" and to other claims based on his "termination" and the insufficient number of hours Kmart assigned to him as an "on-call" pharmacist: complaints he had supposedly abandoned. (Pl.'s Resp. Def.'s Mot. Summ.J. at 1). Nonetheless, the only issue Onuorah addressed in this brief was Kmart's "failure to re-hire [him] as a full-time pharmacist in violation of Title VII and 42 U.S.C.1981," with no further reference to termination, receipt of insufficient hours as an on-call pharmacist, or disability discrimination. (See *Id.*)

In its reply to Onuorah's response brief, Kmart noted that any claims regarding termination or insufficient hours should be rejected because Onuorah had provided no argument in support of them. In addition, Onuorah had not included the insufficient hours claim in his EEOC charge. Onuorah's next brief, a sur-reply to Kmart's reply, responded to Kmart's position on the insufficient hours claim—again disregarding the August stipulation to relinquish this grievance—by declaring that it should survive under § 1981, which does not require exhaustion of administrative remedies. Because Onuorah has expressed contradictory intentions regarding which claims he intends to pursue, we will, pursuant to Kmart's summary judgment motion, rule on all claims presented in the Complaint.

*Factual Background*[1]

Onuorah, a black man born in Nigeria who is now a U.S. citizen, worked as a pharmacist for Kmart for "several" (at least seven) years. (¶¶ 1, 16, 17). In July of 1996 he learned Kmart was terminating him as part of a reduction in force. (¶ 7). In an exit interview on July 17, 1996, he signed a personnel interview record, which advised him his termination was effective August 1, 1996, and that he could "reapply for employment at any location by completing a new Application for Management Employment and submitting it" to the Pharmacy District Manager. (¶ 14). Onuorah never submitted a new Application for Management Employment form after his termination on August 1st. (¶ 15). He was not rehired as a full-time pharmacist. (¶ 28). Onuorah was qualified to be a staff pharmacist, at least in that he "met the minimum requirement and he possessed an Indiana [pharmacist's] license." (¶ 37). He has been licensed in Indiana since 1983. (¶ 17).

During the relevant time period Stan Stevens managed Kmart's Indianapolis Pharmacy District, (¶¶ 18, 70), which meant he oversaw pharmacies in 30 Kmart stores in Indiana and Kentucky, (¶ 71), and was responsible for hiring pharmacists in the district. (¶ 69; Stevens Dep. at 29). Kmart did not dispute Onuorah's account of the hiring process in its response to ¶ 39: that a pharmacist would call Stevens to express interest, and then Stevens would invite the person in for an interview; but, Kmart adds that it required an application as well. (¶ 39).

At his exit interview on July 17, 1996, Onuorah informed Stevens verbally and wrote on the personnel form that he wanted to continue working for Kmart. (¶¶ 29, 30). Onuorah also told Stevens he would work "anywhere" and would work on-call until something full-time came along. (¶ 31). Between his exit interview and date of termination, Onuorah asked Stevens three to four times a week about job openings. (¶ 33).

Onuorah claims Stevens told him there were no openings. (¶ 34). In addition, he was told he would get the first position that became available. (¶ 32). Kmart denies these allegations. (¶¶ 32, 34). According to Kmart, Stevens "repeatedly told [Onuorah] he was eligible to fill out and [sic] application and be considered for openings with other applicants with no Kmart experience." (¶ 32). Kmart also maintains that Stevens gave Onuorah a list of openings at the exit interview. (¶ 34). Onuorah denies ever receiving the list of openings.

While the parties disagree about what Stevens told Onuorah in response to his multiple queries about job openings,[2] there appears to be no dispute that full-time staff pharmacist positions *were* open in Muncie, Huntington, Fort Wayne, Elkhart and Richmond, either as of May 1996, August 1, 1996, or both. (¶¶ 35, 36). The position in Muncie was available until September of 1998. (¶ 41). Stevens hired six individuals between July 31, 1996, and March 30, 1997, all of whom were white Americans, (¶ 68), including at least five new pharmacists during Onuorah's tenure as an on-call pharmacist. (¶¶ 59, 60). Of thirteen pharmacists in Stevens' district who were terminated in Kmart's reduction in force, ten were rehired as full-time pharmacists. (¶¶ 25, 26). The parties dispute whether the rehired pharmacists completed new application forms. (¶ 27). Kmart produced only one rehired employee's written application in response to Onuorah's discovery request. (Stowers Aff. at ¶ 5).

---

**1.** For the reasons set forth below in Section I of the Discussion, the only facts we need to recount involve Kmart's alleged wrongful refusal to rehire Onuorah as a full-time pharmacist. Citations are to numbered paragraphs of and responses to the parties' fact statements, submitted as required by Local Rule 56.1.

**2.** See note 3, *infra*.

Around August 20, 1996, Kmart offered Onuorah work as an "on-call" pharmacist, filling in for regularly scheduled pharmacists who were unavailable due to illness, vacation, etc., which was an hourly position with no employment benefits. (¶¶ 44, 45, 46). Although Kmart asserts that on-call pharmacists must undergo the same employment procedures as full-time pharmacists (which, according to Kmart, means fulfilling the application and interview requirements), Onuorah did not have to fill out a new application or attend an interview to start working as an on-call pharmacist. (¶¶ 48, 49).

While an on-call pharmacist, Onuorah continued to contact Stevens routinely about full-time pharmacist openings, and Onuorah claims that Stevens persisted in telling him there were no openings. When Onuorah filled in for three weeks as an on-call pharmacist at a Columbus, Indiana, Kmart that had a vacancy for a full-time pharmacist, Stevens told him the position was not open. (¶ 54). Onuorah asked Stevens about an opening on the west side of Indianapolis, but Stevens told him he had someone else in mind. (¶ 55). After Onuorah noticed an ad in the Indianapolis Star seeking pharmacists for positions at Kmarts in Indianapolis, Bedford, and Muncie, he once again asked Stevens about openings but was told there were none. (¶¶ 56, 57). When Onuorah confronted him with the ad, Stevens "simply told Plaintiff there were no openings for him." (¶ 58). Kmart's responses to each of these contentions consist of a statement that seems neither to admit nor deny the facts presented, though Kmart must either admit or deny facts under Local Rule 56.1.[3]

*Summary Judgment Standard*

A court should grant a motion for summary judgment if the designated evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c). The moving party may discharge its burden of demonstrating the absence of a triable issue by showing that there are no facts to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, courts construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 680–81 (7th Cir.1999). Neither "the mere existence of some alleged factual dispute between the parties" nor "some metaphysical doubt as to the material facts" will sufficiently establish a triable issue. *Forman v. Richmond Police Dept.*, 104 F.3d 950, 957 (7th Cir.1997) (quoting *Anderson*, 477 U.S. at 247, 252, 106 S.Ct. at 1250, 2512); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If enough evidence exists for a jury to find for the plaintiff on an issue of material fact, the defendant's motion will be denied;

---

**3.** Kmart submitted the same response to all of Onuorah's fact statements on this topic, e.g., to ¶ 40 ("However, when Plaintiff expressed interest and inquired about openings, Stan Stevens would tell him there were no openings.")

*Response*: Not disputed that on various occasions that there were no openings in Kmart pharmacies in Stan Stevens' district, due to transfers of current employees or positions being filled by pharmacists who had followed the application procedures. Nevertheless, Plaintiff was repeatedly informed by Mr. Stevens that Kmart's hiring requirements included an application and interview and

that Mr. Onuorah would have to meet these requirements before he could be considered for any future, full-time openings. (Citations omitted.)

We cannot determine if this response is Kmart's roundabout way of admitting an allegation, or of attempting to deny it. It seems to admit that at times there were no openings, but the undisputed facts show the Muncie job was open until September 1998. There is no outright denial that Stevens told Onuorah on each occasion specified that there was no job open; it is instead a blanket statement that he told Onuorah many times that he was free to go through the application process.

but, the existence of "a mere scintilla of evidence" in support of the plaintiff's position will be insufficient to avoid summary judgment. *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1410 (7th Cir.1984).

Both parties have submitted arguments under the well-known *McDonnell Douglas* burden shifting standard used in discrimination cases. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To survive summary judgment, the plaintiff must establish a prima facie case giving rise to an inference of discrimination. *Id.* The defendant may refute the inference that it acted with discriminatory intent by providing a legitimate, non-discriminatory reason explaining its actions. *Id.* Then, the plaintiff must bring forth evidence to show a dispute exists about whether the defendant's given justification is a pretext for discrimination. *Id.*

■ To establish a prima facie case for failure to rehire, a claimant must show 1) he is a member of a protected class; 2) he applied for an available position for which he was qualified; 3) he did not receive the position; and 4) the position remained available to people with similar qualifications who were not members of the protected class (or that such a person was selected instead of the plaintiff). *Loyd v. Phillips Bros. Inc.*, 25 F.3d 518, 522–23 (7th Cir.1994). These elements are not inflexible and "will inevitably vary" depending on the "type and circumstances of employment action under attack." *Loyd*, 25 F.3d at 523 (citing *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824). The requirement that a plaintiff prove he "actually applied for the post allegedly wrongly refused reflects standing-like concerns" and "closes the causal gap between the employer's decisionmaking process and the complained-of condition of the employee." *Id.* (citations omitted). However, this requirement is not written in stone:

The factual setting of a dispute, not an abstracted formulation never intended to be all things to all cases, will determine what steps a plaintiff needed to have taken in order to sufficiently demonstrate that discriminatory decisionmaking may have actually affected his employment situation. For instance, where an employer ordinarily entertains applications for a certain type of job but a plaintiff is deterred from applying by the very discriminatory practices he is protesting yet can show that he would have applied had it not been for those practices, a sufficient preliminary link between discrimination and adverse consequence is established.

25 F.3d at 523 (citing *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 362–371, 97 S.Ct. 1843, 1868–73, 52 L.Ed.2d 396 (1977); *Babrocky v. Jewel Food Co. & Retail Meatcutters*, 773 F.2d 857, 867 (7th Cir.1985)). *See also Bailey v. Northern Ind. Pub. Serv. Co.*, 910 F.2d 406, 410–411 (7th Cir.1990) (where application process meant expressing interest in position and plaintiff did not show he applied for or was interested in an available position, claim could proceed if evidence showed discriminatory policy made any application futile).

The legitimate reason proffered by a defendant to explain its action need not have been a sound business judgment; courts will not sit as "super-personnel" departments serving to second-guess the employment decisions made by businesses. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986). Even a foolish or trivial rationale will suffice as long as it is not improper or based on discriminatory factors. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984 (7th Cir.1999).

■ A showing by the plaintiff that his employer lied about the reason for its action may support an inference that the employer's real motive was discriminatory. *Jackson*, 176 F.3d at 984 (citations omitted). A plaintiff may prove the defendant's proffered justification for the employment action is pretextual either di-

rectly, by showing that a discriminatory basis more likely than not motivated the employer, or indirectly, by demonstrating that the excuse is unworthy of belief. *Id.* at 983. According to the Seventh Circuit, an explanation is unworthy of credence if it 1) has no basis in fact; 2) did not actually motivate the action; or 3) was insufficient to motivate the action. *Id.*; *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 931 (7th Cir.1996); *Mechnig v. Sears, Roebuck and Co.,* 864 F.2d 1359, 1364–65 (7th Cir.1988) (citations omitted). *See also Collier v. Budd,* 66 F.3d 886, 892 (7th Cir.1995) (reciting factors, noting summary judgment motions in employment discrimination cases approached with "added rigor" because central issues are credibility and intent, and quoting *Courtney v. Biosound,* 42 F.3d 414, 418 (7th Cir.1994): "Affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.")

*Discussion*

1. Discriminatory Termination and Insufficient Hours / Disability Discrimination

Because Onuorah presented no arguments opposing Kmart's motion regarding his termination, he cannot succeed on any claim arising therefrom. A party opposing a well-supported summary judgment motion must respond affirmatively with "specific facts showing that there is a genuine issue for trial"; it may not simply rest on the allegations of the pleadings. *See* Fed. R.Civ.P. 56(e). While Onuorah presented some facts regarding his termination and his job performance, he provided no explanation whatsoever of how the facts support his claim, and it cannot survive. The same fate befalls the insufficient hours claim (regardless of whether it should have been included in an administrative charge) and

all charges of disability discrimination. The Court GRANTS Defendant's Motion for Summary Judgment with respect to the wrongful termination and insufficient hours claims of Counts I and II of the Complaint, as well as all of Count III (alleging ADA violations), and turns its attention to the remaining claim: that Kmart chose not to rehire Onuorah after his termination because of his race and/or national origin.

II. Failure to Rehire

A. Prima Facie Case.

Onuorah, a black male originally from Nigeria, is undeniably a member of a class protected by § 1981 and Title VII. Kmart concedes it selected people outside the protected class for full-time pharmacist positions, but did not hire Onuorah even though he met the threshold qualifications to be considered (he had an Indiana pharmacist's license). The parties disagree on the remaining piece of the prima facie case: whether Onuorah "applied for" any pharmacist positions. We find significant disputes surrounding the key questions regarding this element[4]: What was the application procedure for Kmart pharmacists? Did Onuorah fulfill the requirements of Kmart's application procedure? If he did not satisfy those requirements, was his failure due to Kmart's discriminatory practices?

An important issue about which the parties present divergent views concerns how Kmart actually entertained pharmacists' employment applications. Onuorah attests that Kmart's 'application process' consisted of no more than an interested pharmacist's query to the district manager regarding positions, after which the manager would invite the applicant for an interview and make the decision whether to hire him. He denies applicants needed to fill out a form. Kmart states that it expected

---

4. Because Kmart offers as its reason for not rehiring Onuorah that he did not fill out an application and have an interview, and this is also an element of the prima facie case, the discussion of whether Onuorah has satisfied this element overlaps with the analysis of whether Kmart's proffered explanation for its action was a pretext.

applicants to express "interest in employment with Kmart," "attend[] an interview" with Mr. Stevens, and fill out a written application for management employment. (¶ 77).

Q: What is the typical procedure that you use when you hire pharmacists?

A: The pharmacist notifies me that they are interested in a position. I set up a time to interview the pharmacist for a specified interview that they would request. They fill out an application for management employment at the time of interview, and I interview the candidate. (Stevens Dep. at 21).

Onuorah and Kmart seem to agree that an interview was part of the 'application process', (See ¶ 39), but their views differ on how candidate interviews were arranged, There is no definitive evidence presented regarding who was supposed to initiate or request the interview. By citing Onuorah's failure to ask for an interview, Kmart places responsibility upon the applicant, whereas Onuorah says Kmart would 'invite' people in for interviews. · He also claims the interview was not a prerequisite for hiring based on his own hiring as an on-call pharmacist despite the lack of written application or interview. It is also unclear from the testimony quoted above if Stevens meant applicants *specifically* request an interview, request an interview for a *specific* position, or just *specify* a particular position when Stevens sets up the interview.

Onuorah offers not just his own statements to prove his version of how Kmart's application process worked, but corroborates his claims with some of the undisputed facts. For example, he raises an infer-

ence that the 'application process' did not (at least for everyone) include filling out an application form. (See further discussion below in the section on Pretext.) Kmart produced only one application form filled out by a rehired pharmacist. It rehired ten individuals. It is also undisputed that when Kmart hired Onuorah as an on-call pharmacist, using the same 'application procedures' as for full-time pharmacists, it did not require Onuorah to fill out an application. In addition, the undisputed facts show that, at least for Onuorah's case, an interview was not necessary to rehire him as an on-call pharmacist, leading to the inference (as with the form requirement) that Kmart did not require completion of an interview as part of the hiring procedure for its pharmacist positions.

Because the true nature of the application requirement is unclear, a conflict also exists about whether Onuorah fulfilled the application requirements. Onuorah acknowledges he did not request or attend an interview; nor did he request or complete a formal application form for any position. Onuorah has offered evidence that he met Kmart's application requirements as he claims they were practiced, by expressing interest and persistently contacting Stevens about openings. There is no evidence that he was offered an interview but refused to go because he believed the requirement was silly for people who had already worked at Kmart. At his deposition, Stevens testified Onuorah never specifically asked him for a job as a pharmacist [5], but also claims he instructed Onuorah "that he would need to fill out an application for management employment and attend an interview if he wanted to be

5. Stevens' reports of his conversations with Onuorah seem to contradict themselves. For example, we find it odd that Stevens said he "repeatedly" informed Onuorah of the procedures he needed to complete to be eligible for full-time employment, while also (in contrast to Onuorah's claim that he called Stevens to ask him about permanent jobs) maintaining that Onuorah *never* asked him for a full-time pharmacist job. Denying that their conversa-

tions were basically inquiries about full-time work, Stevens said they discussed the assignment of Onuorah's on-call hours. (Stevens Dep. at 32). This is confusing in light of Stevens' additional testimony at his deposition, and in his sworn statement, that he didn't generally deal with scheduling of on-call pharmacists and that the individual store usually contacted the on-call pharmacist about hours. (Stevens Dep. at 24).

considered for full-time employment," (¶ 83), and that Onuorah did not do so. Onuorah denies he was told this, and insists that the reason he did not schedule an interview is because he did not know he was supposed to. A fact-finder could infer, and Kmart presents no evidence to contradict, that Onuorah would have scheduled an interview if told to do so, given his persistence in contacting Stevens and his acceptance of on-call work.

Assuming Kmart *did* require a formal application beyond merely expressing interest (e.g., requesting and filling out a form, and/or specifically requesting an interview) the parties agree Onuorah never asked for the formal application or interview, and did not fulfill the requirement as Kmart has described it. A clear dispute exists between the parties as to the material fact of what (if anything) Onuorah was told about how to reapply with Kmart. Onuorah claims he repeatedly asked Stevens about potential job openings, but that Stevens always told him there were none available. Onuorah steadfastly maintains that Stevens never told him he needed to resubmit a formal application and schedule a formal interview in order to be considered for a position, or that he should apply even in the absence of openings. In direct contrast to Onuorah's contentions, Stevens swears that he gave Onuorah a list of openings available in the company when Onuorah was terminated, and that he informed Onuorah on several occasions that he must comply with company procedures to be considered for a position, including submitting a new application to Stevens and scheduling an interview with him.

■ Onuorah argues he should be excused from showing he complied with Kmart's 'official' requirements because, despite his repeated inquiries about open positions, Kmart unlawfully deterred him

from applying: Stevens, instead of telling him to request an interview and fill out an application, told Onuorah there were no jobs available. If an employer acting from discriminatory motives dissuades minorities from applying by telling them there are no openings, or by not informing (or misinforming) minorities of the proper application process, the would-be applicants could never establish this element of the prima facie case. In other words, a form of discrimination exists where the employer misinforms people (based on their race, for example) about the proper application process, and then denies jobs to those same people because they did not comply with the proper procedures. Would-be applicants are not required to read employers' minds to fulfill the application requirement and establish a prima facie case of discrimination; employers must not improperly select who will be told of the true requirements. They must also enforce their requirements without regard to race. See *Friedel v. City of Madison*, 832 F.2d 965, 974 (7th Cir.1987) (Employers may establish wide range of disciplinary policies, but violate Title VII if policies are not "applied, alike to members of all races.") (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278–80, 96 S.Ct. 2574, 2580, 49 L.Ed.2d 493 (1976)).

■ If Stevens continually lied to Onuorah about the existence of job openings, Onuorah could reasonably have concluded it would be futile to apply—why should he submit an application when there were no positions 'for him', and no indications that such an opening would ever arise? Kmart contends that Onuorah could have submitted an application to be considered for positions that would become available in the future [6], but Onuorah claims he did not understand the application process to work that way, and that no one explained it differently to him. We think Onuorah has

---

**6.** However, Stevens' statement, quoted above, could be interpreted to mean that pharmacists interview for a *specific* position, undercutting Kmart's assertion that generally, no position need be open when a candidate ap-

plies for management employment and attends an interview. (See ¶ 84). His statement did not indicate whether pharmacists contacted him about "a" specific position, or just "a" position in general.

presented enough facts so that a reasonable fact-finder could believe he would have fulfilled Kmart's 'application requirements' if he had not been deterred by Kmart's discriminatory practices.

## B. Legitimate Non–Discriminatory Reason.

Kmart submits, as its grounds for refusing to rehire Onuorah as a full-time pharmacist, that Onuorah did not follow the proper application procedures; i.e., filling out the Management Application and scheduling an interview. Employers are certainly permitted to establish threshold expectations of prospective workers, and are equally entitled to reject applicants who do not meet their specifications. To rebut the presumption of discrimination engendered by the plaintiff's prima facie case, the defendant need only provide one non-discriminatory basis for its action against the plaintiff; at this stage the Court will not engage in determinations of adequacy. We accept Kmart's explanation as sufficient to rebut the presumption of discrimination established by Onuorah.

## C. Pretext.

While he does not provide direct evidence that discriminatory animus more likely than not motivated Kmart's refusal to rehire him, Onuorah presents indirect proof to raise points of contention about whether Kmart's explanation, that he did not comply with the application requirement, is worthy of belief. Onuorah maintains that Kmart did not really require applicants to complete a Management Application and schedule an interview; or, if it did, it applied the requirement in a discriminatory manner.

Kmart's explanation has some basis in fact: Kmart documented that at least one rehired pharmacist submitted a written application. This is certainly not overwhelming proof, but we must refrain from weighing the evidence at this stage. However, as discussed above in the context of the prima facie case, the facts surrounding whether or not Kmart required all of its pharmacists to complete its 'application procedure' are hotly contested. We find Onuorah has raised significant questions of fact about whether the lack of a written application or interview actually motivated or was sufficient to motivate Kmart's decision not to rehire him.

Kmart has not challenged a number of the facts cited by Onuorah in support of his argument that Kmart's proffered reasons are a pretext or a reason furnished to obscure its true discriminatory motive. Some of these undisputed points suggest that Kmart did not really compel prospective workers to fill out an application or ask for an interview. There is no evidence that Kmart rejected similarly situated applicants—ones who expressed interest to Stevens in working for Kmart, but did not request interviews or applications—on these grounds. In contrast, there is evidence that Kmart hired and rehired applicants who, like Onuorah, expressed interest in pharmacist positions, and (while they may or may not have asked for interviews or for an application) do not seem to have filled out the 'necessary' application. Kmart produced only one written application from a rehire. Because we must draw inferences in favor of Onuorah as the non-moving party, we can infer that Kmart only required one out of the ten pharmacists it rehired to fill out a formal application. In addition, all of the rehires for whom Kmart produced no application forms were white Americans.

If Kmart had blamed its refusal to rehire Onuorah on his prior performance, his poor ratings on his last review, or Stevens' belief that he couldn't do the job well, challenging those reasons would be more difficult because they are subjective. But in this situation we have (if believed) evidence that Kmart rehired nine white pharmacists who did not formally reapply after termination, leaving no explanation why it did not consider rehiring Onuorah, too. Viewing the facts in the light most favorable to Onuorah, we believe a reasonable

jury could find that Onuorah's neglecting to formally apply for a position was not the real reason that Kmart did not rehire Onuorah.

Kmart disputes the truth of this conclusion. Yet, even without the missing application forms, Onuorah has furnished weighty evidence surrounding Kmart's hiring of him as an on-call pharmacist, that provides additional support for the proposition that Kmart did not require an application from potential hires. Kmart maintains that its hiring process for on-call personnel is the same as for full-time pharmacists, and presented no evidence that it followed different procedures in 1996:

Q: ... how does a person become an on-call pharmacist?

A: They have to request an interest in becoming an on-call pharmacist, go through the same procedure and interview, fill out an application for employment. (Stevens Dep. at 23).

Stevens confirmed that on-call pharmacists go through the same hiring process as full-time pharmacists. (Stevens Dep. At 24). Kmart admits it did not require Onuorah to fill out an application or have an interview before it retained him for on-call duty. But, Kmart claims that it did not hire Onuorah for a *permanent* position because he did not complete the proper hiring procedure, which it claims is identical to the on-call hiring procedure. Furthermore, Kmart did not give Onuorah a full-time position because it did not want to "make an exception" to its procedures for him; it says it treated all applicants identically.

It is interesting how Onuorah could be eligible for and hired for on-call work, but not, based on his failure to complete the procedures, for full-time employment, when the application procedures were the same for both. From this confusing supposition, the Court infers that Kmart either 1) did make an exception to the application requirement when Onuorah applied for on-call work (which would mean the policy was not enforced consistently, and that it might also have made exceptions for white people who wanted full-time jobs); or 2) that an application was not part of Kmart's hiring requirement.

Because the application requirement, if it existed at all, was unevenly enforced, Onuorah's lack of adherence was not, standing alone, sufficient reason to reject him. The Court finds that Onuorah has at least raised triable fact issues that Kmart's reason was insufficient to motivate its action, by demonstrating that Kmart inconsistently applied its supposed requirements for hiring. See *Mechnig*, 864 F.2d at 1365 (acknowledging that non-compliance with unevenly enforced policy may be insufficient grounds to motivate discharge).

### Conclusion

For the reasons stated above, we DENY Kmart's Motion for Summary Judgment as to Onuorah's claim that Kmart failed to rehire him on account of his race and/or national origin. The issue of whether Kmart treated Onuorah differently with respect to hiring than the other (white) pharmacists, particularly those who had been terminated in the reduction in force, is central to deciding this discrimination case. Because a number of significant facts remain in dispute, the Court finds that summary judgment is inappropriate on the issue of whether Kmart discriminated against Onuorah because he is a black Nigerian when it refused to rehire him. However, no conflict has persisted regarding Onuorah's termination, insufficient hours, or ADA claims; we therefore GRANT Kmart's Motion for Summary Judgment on all other claims.